# EXHIBIT A

# ROCKIN' JUMP
# FRANCHISE AGREEMENT

## JUMP BUFFALO GROVE LLC

## BUFFALO GROVE, ILLINOIS

EAST\146514907.3

EXHIBIT 1

# TABLE OF CONTENTS

1. PREAMBLES, ACKNOWLEDGMENTS AND REPRESENTATION.........................................1
   1.1 PREAMBLES. ...........................................................................................................................1
   1.2 ACKNOWLEDGMENTS. ......................................................................................................1
   1.3 REPRESENTATION...............................................................................................................2
   1.4 CERTAIN DEFINITIONS. ....................................................................................................2
2. YOUR ORGANIZATION AND MANAGEMENT. ....................................................................5
   2.1 ORGANIZATIONAL DOCUMENTS. ................................................................................5
   2.2 DISCLOSURE OF OWNERSHIP INTERESTS...................................................................6
   2.3 RESPONSIBLE PERSON/MANAGEMENT OF BUSINESS. ............................................6
   2.4 CONTROL GROUP. ..............................................................................................................6
   2.5 FACILITY ORGANIZATION. ..............................................................................................7
3. GRANT OF RIGHTS. ....................................................................................................................7
   3.1 GRANT OF FRANCHISE......................................................................................................7
   3.2 OUR RESERVATION OF RIGHTS. ....................................................................................7
4. LOCATION SELECTION, LEASE OR PURCHASE OF LOCATION AND LOCATION DEVELOPMENT. ...........................................................................................................................8
   4.1 LOCATION SELECTION AND APPROVAL. ....................................................................8
   4.2 PURCHASE OR LEASE OF THE LOCATION...................................................................8
   4.3 LOCATION DEVELOPMENT.............................................................................................9
   4.4 YOUR OBLIGATIONS. ......................................................................................................11
   4.5 FIXTURES, FURNISHINGS, EQUIPMENT AND SIGNS.................................................10
   4.6 START-UP INVENTORY, FURNITURE, FIXTURES, SOFTWARE, EQUIPMENT AND SUPPLIES. ......................................................................................................................10
   4.7 BUSINESS COMMENCEMENT. .......................................................................................11
   4.8 COMMENCEMENT DEADLINE. ......................................................................................11
   4.9 GRAND OPENING MARKETING......................................................................................11
   4.10 OPENING ASSISTANCE. .................................................................................................11
5. FEES. .............................................................................................................................................12
   5.1 INITIAL FRANCHISE FEE.................................................................................................12
   5.2 ROYALTY. ..........................................................................................................................12
   5.3 DESIGNATED ACCOUNT.................................................................................................12
   5.4 INTEREST ON LATE PAYMENTS. ..................................................................................12
   5.5 APPLICATION OF PAYMENTS........................................................................................12
   5.6 AUTHORIZED EFT PAYMENT. .......................................................................................12
   5.7 NON-COMPLIANCE FINE.................................................................................................13

EAST\146514907.3

RJFA (3/17)

EXHIBIT 1

JBG 000113

| | | |
|---|---|---|
| 5.8 | INSPECTION AND COMPLIANCE REIMBURSEMENT | 13 |
| 6. | TRAINING, ASSISTANCE, AND METHODS OF OPERATION. | 13 |
| 6.1 | TRAINING. | 13 |
| 6.2 | REFRESHER TRAINING. | 14 |
| 6.3 | GENERAL GUIDANCE. | 14 |
| 6.4 | ON-SITE CONSULTATION AND ADDITIONAL GUIDANCE. | 14 |
| 6.5 | OPERATIONS MANUAL. | 15 |
| 6.6 | COMPLIANCE WITH METHODS OF OPERATION. | 16 |
| 6.7 | WORKS MADE-FOR-HIRE. | 16 |
| 6.8 | GENERAL CONDUCT. | 16 |
| 6.9 | CYBER-EVENT/IDENTITY THEFT. | 16 |
| 7. | MARKS. | 16 |
| 7.1 | OWNERSHIP AND GOODWILL OF MARKS. | 16 |
| 7.2 | LIMITATIONS ON YOUR USE OF MARKS. | 17 |
| 7.3 | NOTIFICATION OF INFRINGEMENTS AND CLAIMS. | 17 |
| 7.4 | DISCONTINUANCE OF USE OF MARKS. | 17 |
| 7.5 | INDEMNIFICATION OF FRANCHISEE. | 17 |
| 8. | CONFIDENTIAL INFORMATION. | 18 |
| 8.1 | CONFIDENTIAL INFORMATION. | 18 |
| 8.2 | FOR BUSINESS USE ONLY. | 18 |
| 8.3 | IDEAS, CONCEPTS, TECHNIQUES OR MATERIALS. | 19 |
| 9. | ROCKIN' JUMP METHODS OF OPERATION. | 19 |
| 9.1 | COMPLIANCE WITH METHODS OF OPERATION. | 19 |
| 9.2 | PROVISIONS OF THIS AGREEMENT. | 21 |
| 9.3 | MODIFICATION OF METHODS OF OPERATION. | 21 |
| 9.4 | CONDITION OF YOUR BUSINESS. | 21 |
| 9.5 | UNIFORM IMAGE. | 22 |
| 9.6 | PURCHASE OF OTHER PRODUCTS. | 22 |
| 9.7 | COMPLIANCE WITH LAWS. | 23 |
| 9.8 | PERSONNEL. | 23 |
| 9.9 | INSURANCE. | 24 |
| 9.10 | QUALITY CONTROL. | 25 |
| 9.11 | PRICING POLICIES. | 25 |
| 9.12 | MANDATORY SECURITY CAMERAS. | 25 |
| 9.13 | RECIPROCAL MEMBERSHIP/COUPONS. | 25 |
| 9.14 | LIMITATIONS ON POINT-OF-SALE SYSTEM AND FINES. | 285 |

EAST\146514907.3

RJFA (3/17)

**EXHIBIT 1**

JBG 000114

10.    MARKETING. ............................................................................................................25

10.1   NATIONAL ADVERTISING. .................................................................................25

10.2   ACCOUNTING. .......................................................................................................26

10.3   PROPORTIONALITY. .............................................................................................26

10.4   DEFERRALS OR REDUCTIONS. ..........................................................................27

10.5   LOCAL ADVERTISING. .........................................................................................27

10.6   ADVERTISING COOPERATIVES. .........................................................................28

10.7   COMMUNITY MARKETING PROGRAMS. ...........................................................29

10.8   PARTICIPATION IN INTERNET WEB SITE OR OTHER ON-LINE
COMMUNICATIONS.  . ................................................................................................4629

10.9   TRUTHFUL ADVERTISING, MARKETING AND PROMOTION. ..........................30

11.    RECORDS, REPORTS AND FINANCIAL STATEMENTS. .......................................30

11.1   RECORDS. ..............................................................................................................30

11.2   PERIODIC REPORTS. .............................................................................................31

11.3   VERIFICATION. ......................................................................................................31

12.    INSPECTIONS AND AUDITS. ..................................................................................32

12.1   OUR RIGHT TO INSPECT THE BUSINESS. ..........................................................32

12.2   COOPERATION. ......................................................................................................32

12.3   OUR RIGHT TO AUDIT. .........................................................................................32

13.    TRANSFER. ..............................................................................................................33

13.1   BY US. .....................................................................................................................33

13.2   BY YOU. ..................................................................................................................33

13.3   CONDITIONS FOR APPROVAL OF TRANSFER. ..................................................33

13.4   TRANSFER TO A WHOLLY OWNED ENTITY. .....................................................35

13.5   TRANSFER UPON YOUR DEATH OR DISABILITY. .............................................35

13.6   OPERATION UPON YOUR DEATH OR DISABILITY. ............................................35

13.7   BONA FIDE OFFERS. ..............................................................................................36

13.8   OUR RIGHT OF FIRST REFUSAL. .........................................................................36

13.9   NON-EXERCISE. .....................................................................................................37

14.    EXPIRATION OF THIS AGREEMENT. ....................................................................37

14.1   ACQUISITION OF A SUCCESSOR FRANCHISE. ..................................................37

14.2   GRANT OF A SUCCESSOR FRANCHISE. .............................................................37

14.3   NO GRANT. .............................................................................................................37

14.4   90 DAY CURE. .........................................................................................................37

14.5   AGREEMENTS/RELEASES. ....................................................................................38

15.    TERMINATION OF AGREEMENT. ..........................................................................38

EAST\146514907.3

EXHIBIT 1

RJFA (3/17)

JBG 000115

15.1 BY YOU. ...................................................................................................................38

15.2 IMMEDIATE TERMINATION. .................................................................................38

15.3 TERMINATION UPON NOTICE. .............................................................................39

15.4 OUR RIGHT TO OPERATE THE BUSINESS AND MANAGEMENT FEE..........................41

15.5 ALTERNATIVES TO TERMINATION........................................................................41

16. OUR AND YOUR RIGHTS AND OBLIGATIONS UPON TERMINATION OR EXPIRATION OF THIS AGREEMENT.............................................................................................................42

16.1 PAYMENT OF AMOUNTS OWED TO US - LIQUIDATED DAMAGES...........................42

16.2 MARKS. ..................................................................................................................42

16.3 DE-BRANDING. .......................................................................................................43

16.4 CONFIDENTIAL INFORMATION. ..............................................................................44

16.5 IN-TERM COVENANT NOT TO COMPETE. ...............................................................44

16.6 POST-TERM COVENANT NOT TO COMPETE. ...........................................................44

16.7 REASONABLE SCOPE OF COVENANTS....................................................................45

16.8 REDUCTION OF SCOPE OF COVENANTS.................................................................45

16.9 COVENANT NOT TO COMPETE UPON EXERCISE OF RIGHT OF FIRST REFUSAL....45

16.10 COMMENCEMENT BY ORDER. ..........................................................................45

16.11 OUR RIGHT TO PURCHASE BUSINESS. ..............................................................46

16.12 CONTINUING OBLIGATIONS..............................................................................47

17. SECURITIES OFFERINGS. ...........................................................................................47

17.1 SECURITIES OFFERINGS. ........................................................................................47

18. RELATIONSHIP OF THE PARTIES AND INDEMNIFICATION. ............................................48

18.1 INDEPENDENT CONTRACTORS................................................................................48

18.2 NO LIABILITY FOR ACTS OF OTHER PARTY...........................................................48

18.3 TAXES....................................................................................................................49

18.4 INDEMNIFICATION..................................................................................................49

18.5 MITIGATION NOT REQUIRED. .................................................................................50

19. ENFORCEMENT AND MISCELLANEOUS MATTERS.........................................................50

19.1 SEVERABILITY AND SUBSTITUTION OF VALID PROVISIONS....................................50

19.2 LESSER COVENANT ENFORCEABLE.......................................................................50

19.3 GREATER NOTICE. .................................................................................................50

19.4 WAIVER OF OBLIGATIONS......................................................................................50

19.5 NON-WAIVER.........................................................................................................51

19.6 FORCE MAJEURE. ..................................................................................................51

19.7 EXTEND PERFORMANCE. ........................................................................................51

19.8 OUT-OF-STOCK AND DISCONTINUED. ...................................................................52

RJFA (3/17)

**EXHIBIT 1**

19.9     COSTS AND ATTORNEYS' FEES. ....................................................................52

19.10    YOU MAY NOT WITHHOLD PAYMENTS DUE TO US. .....................................52

19.11    RIGHTS OF PARTIES ARE CUMULATIVE. .......................................................52

19.12    DISPUTE RESOLUTION. ....................................................................................52

19.13    GOVERNING LAW. ............................................................................................56

19.14    CONSENT TO JURISDICTION. .........................................................................536

19.15    WAIVER OF PUNITIVE DAMAGES, JURY TRIAL AND CLASS ACTIONS. ...............57

19.16    BINDING EFFECT. .............................................................................................57

19.17    LIMITATIONS OF CLAIMS. ..............................................................................57

19.18    CONSTRUCTION. ..............................................................................................57

19.19    WITHHOLD APPROVAL. ...................................................................................57

19.20    HEADINGS. ........................................................................................................57

19.21    JOINT AND SEVERAL OWNERS' LIABILITY. ..................................................57

19.22    ANTI-TERRORISM LAWS. ................................................................................58

19.23    RIGHT TO INFORMATION. ...............................................................................58

19.24    MULTIPLE COPIES. ..........................................................................................58

19.25    ENTIRE AGREEMENT BETWEEN THE PARTIES. ............................................58

19.26    AMENDMENTS. .................................................................................................58

20.     NOTICES AND PAYMENTS. ..............................................................................59

20.1     NOTICES. ............................................................................................................59

20.2     PAYMENTS. ........................................................................................................59

20.3     NO REPRESENTATION OF SUCCESS. ..............................................................59

| APPENDIX A | OWNERSHIP ADDENDUM |
|---|---|
| APPENDIX B | OWNERS' PERSONAL GUARANTY OF FRANCHISEE'S OBLIGATIONS |
| APPENDIX C | OWNER PERSONAL COVENANTS REGARDING CONFIDENTIALITY AND NON- COMPETITION |
| APPENDIX D | SILENT INVESTORS |
| APPENDIX E | ASSIGNMENT OF TELEPHONE NUMBERS |
| APPENDIX F | ADDENDUM TO LEASE |
| APPENDIX G | LOCATION ACKNOWLEDGEMENT ADDENDUM |

RJFA (3/17)

EAST\146514907.3

EXHIBIT 1

JBG 000117

## ROCKIN' JUMP FRANCHISE AGREEMENT

**THIS FRANCHISE AGREEMENT** (the "Agreement") is made and entered into as of the Effective Date (as defined herein) Rockin' Jump Franchise, LLC, a limited liability company formed under California law, with its principal business address at 5502 Sunol Boulevard, Pleasanton, CA 94566 (referred to in this Agreement as "we," "us" or "our"), and Jump Buffalo Grove LLC, a _____ limited liability company, with a principal address of 545 Orchard Pond Drive, Lake Zurich, Illinois 60047 (referred to in this Agreement as "you," "your" or "owner").

1.    **PREAMBLES, ACKNOWLEDGMENTS AND REPRESENTATION.**

   1.1    **PREAMBLES.**  This Agreement governs your ownership and operation of one **ROCKIN' JUMP** business offering indoor trampoline parks and entertainment facilities for group and individual arena style jumping including freestyle jumping areas, dodge ball, basketball, foam pits, zip lines and other attractions, party rooms, cafes and free wi-fi as well as related services and ancillary merchandise as we may authorize from time to time. These businesses operate under the **ROCKIN' JUMP** name and under business formats, methods, procedures, designs, layouts, standards and specifications, all of which we may improve, further develop or otherwise modify from time to time. We use, promote and license certain trademarks, service marks and other commercial symbols in the operation of **ROCKIN' JUMP** businesses**,** including the **ROCKIN' JUMP** trademarks and service marks and associated logos. We have a license to use the Marks and to sublicense the Marks to franchisees. We grant franchises to persons who meet our qualifications and are willing to undertake the investment and effort required to own and operate a **ROCKIN' JUMP** business offering the products and services we authorize and approve and utilizing our business formats, methods, procedures, signs, designs, layouts, equipment, standards and specifications and the Marks. You have indicated to us by your actions and statements that you desire a franchise to own and operate a **ROCKIN' JUMP** business.

   1.2    **ACKNOWLEDGMENTS.** You acknowledge that you have read this Agreement and our Franchise Disclosure Document ("**FDD**") and understand and accept the terms, conditions and covenants contained in this Agreement as being reasonably necessary to maintain our high standards of quality and service and the uniformity of those standards at each **ROCKIN' JUMP** business and thereby to protect and preserve the goodwill of the Marks. You acknowledge that you have conducted an independent investigation of the business venture contemplated by this Agreement and recognize that, like any other business, the nature of the business conducted by a **ROCKIN' JUMP** business may evolve and change over time, that an investment in a **ROCKIN' JUMP** business involves business risks and that your business abilities and efforts are vital to the success of the venture. You acknowledge and agree that we and you are and will be independent contractors and that nothing in this Agreement is intended to make either you or us a general or special agent, joint venturer, partner or employee of the other for any purpose. You agree to always indicate your status as an independent contractor and

1

franchisee on any document or information released by you in connection with the BUSINESS. Further, you will display the following notice in a prominent place at the BUSINESS: *"This Rockin' Jump franchise is independently owned and operated."* Any information you acquire from other **ROCKIN' JUMP** franchisees relating to their sales, profits or cash flows does not constitute information obtained from us, nor do we make any representation as to the accuracy of any such information. You acknowledge that, in all of their dealings with you, our officers, directors, employees and agents act only in a representative, and not in an individual, capacity. All business dealings between you and such persons as a result of this Agreement are solely between you and us. You further acknowledge that we have advised you to seek franchise counsel to review and evaluate this Agreement.

1.3    **REPRESENTATION.**  You represent to us, as an inducement to our entry into this Agreement, that all statements you have made and all materials you have submitted to us in connection with your purchase of the franchise are accurate and complete and that you have made no misrepresentations or material omissions in obtaining the franchise. We have approved of your purchasing a franchise in reliance upon all of your representations.

1.4    **CERTAIN DEFINITIONS.**  The terms listed below have the meanings which follow them and include the plural as well as the singular. Other terms are defined elsewhere in this Agreement in the context in which they arise.

"Accounting Period" - Each monthly period during the term of the Agreement.

"Ad Fee" - Defined in Article 10.1.

"Affiliate" - Any person or entity that directly or indirectly owns or controls the referenced party, that is directly or indirectly owned or controlled by the referenced party, or that is under common control with the referenced party. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction, of the management and policies of an entity, whether through ownership of voting securities, by contract or otherwise.

"Approved Supplier" - Any supplier, including us, an Affiliate of ours or an independent third party, whom we authorize to act as an approved supplier of services or goods.

"BUSINESS" - The ROCKIN' JUMP business operated by you at the franchise location under the terms of this Agreement.

"Competitive Business" - Any trampoline park, inflatable indoor bouncing, rock climbing, go carts, miniature golf, family fun centers or similar family entertainment establishments.

2

"Confidential Information" - Defined in Article 8.1. "Control Group" - Defined in Article 2.4.

"EFT" - The term "EFT" means the electronic transfer of funds to us from a credit card, debit card or bank account, as well as any other current or future form of pre- authorized payment.

"Immediate Family" - Spouse, parents (including step parents), siblings (including half siblings), and children (including step children), whether natural or adopted.

"Initial Term" - Defined in Article 3.1.

"Internet" - All communications between computers and between computers and television, telephone, facsimile and similar communications devices, including the World Wide Web, proprietary online services, E-mail, news groups and electronic bulletin boards.

"LAF" - Local Advertising Funds, as defined in Article 10.5. "Location" - The franchise location identified in Article 3.1.

"Mandatory Vendor" - Any supplier of goods or services to your BUSINESS that we designate under our Methods of Operation as a "Mandatory Vendor".

"Marks" - The current and future trade names, trademarks, service marks and trade dress used to identify the services and/or products offered by ROCKIN' JUMP businesses, including the mark "ROCKIN' JUMP" and the distinctive building design and color scheme of ROCKIN' JUMP businesses.

"Methods of Operation" - The information we provide to you containing mandatory and suggested specifications, standards, operating procedures and rules that we prescribe from time to time for the operation of a ROCKIN' JUMP business, including but not limited to the Operations Manual and any other information we provide to you during the term of the Agreement relating to your operation of the franchise business or to any other of your obligations under this Agreement and related agreements.

"NAF" - Our National Advertising Fund, as defined in Article 10.1.

"Operations Manual" - Our confidential policy manual, as amended from time to time, which may consist of one or more manuals, including any of our operating system manuals, compliance manuals, and management training manuals, containing our mandatory and suggested standards, specifications and operating procedures relating to the development and operation of **ROCKIN' JUMP** businesses and other information relating to your obligations under this Agreement. The term "Operations Manual" also includes alternative or supplemental means of communicating such information by other media,

EAST\146514907.3

**EXHIBIT 1**

including but not limited to lists, templates, bulletins, e-mails, videotapes, audio tapes, compact discs and CD-ROM, and any information we share with you through our company intranet or project management system.

"Owner" - Each person that has any direct or indirect legal or beneficial ownership interest in you, if you are a business corporation, partnership, limited liability company or other legal entity. Each Owner that has greater than ten percent (10%) interest in you, if you are a business corporation, partnership, limited liability company or other legal entity, must sign **Appendix B** to this Agreement (Owners' Personal Guaranty of Franchisee's Obligations). Each Owner that: (i) has greater than ten percent (10%) interest in you, if you are a business corporation, partnership, limited liability company or other legal entity, or: (ii) is given access to our Confidential Information; must sign and **Appendix C** to this Agreement (Owner Personal Covenants Regarding Confidentiality and Non-Competition). However, if we are entering into this Agreement totally or partially based on the financial qualifications, experience, skills or managerial qualifications of any person or entity who directly or indirectly owns ten percent (10%) or less interest in the franchisee, we have the right to designate that person as an Owner who must sign **Appendix B** to this Agreement. In addition, if the franchisee is a partnership entity, then each person or entity who, now or hereafter is or becomes a general partner is deemed an Owner who must sign **Appendix B** and **Appendix C**, regardless of the percentage ownership interest. If the franchisee is one or more individuals, each individual is an Owner. Each franchisee must have at least one Owner. Your Owner(s) is/are identified on **Appendix A** to this Agreement. Every time there is a change in the persons or entities who are your Owners, you must, within seven (7) calendar days from the date of such change, notify us of the change and cooperate with us in updating **Appendix A**. As used in this Agreement, any reference to Owner includes all Owners.

"Personnel" - All persons employed by you in connection with the development, management or operation of your BUSINESS, including persons in general and district management positions for your ROCKIN' JUMP BUSINESS, crew trainers, unit general and assistant managers, shift supervisors, hourly employees and all other persons who work in or for your BUSINESS.

"Preferred Vendor" - Any supplier of goods or services to your BUSINESS that we designate under our Methods of Operation as a "Preferred Vendor".

"Pre-Opening Marketing Period" - Defined in Article 4.10.

"Responsible Person" - The individual you so designate in **Appendix A** and any replacement thereof approved by us. The Responsible Person must be someone who has the authority to, and does in fact, actively direct your business affairs related to the BUSINESS.

RJFA (3/17)

EAST\146514907.3

JBG 000121

EXHIBIT 1

"Royalty Billing Day" - The day each calendar month that we designate that we or our authorized designee are authorized by you to withdraw via electronic funds transfer from your designated bank account all Royalty fees and other amounts then due to us under the terms of the Agreement, as identified in Article 5.3

"Silent Investor" - All individuals and/or entities identified in **Appendix D**.

"System" - The business methods, designs and arrangements for developing and operating ROCKIN' JUMP businesses, which include the Marks, building design and layouts, equipment, training, and certain operating and business standards and policies, all of which we may improve, further develop or otherwise modify from time to time.

"Total Gross Revenues" - includes all corporate events, memberships and membership packages, Dodgeball leagues, ROCKIN' Robics, ROCKIN' parties, ROCKIN' Fridays, ROCKIN' Saturdays and any other services performed at your location. Total Gross Revenue also includes food and beverage revenue/commissions. Total Gross Revenue does not include returns or sales taxes charged to customers or sales of apparel (including but not limited to socks, shirts, bracelets, etc.) or sales of other goods such as sports equipment.

"Transfer" - The voluntary, involuntary, direct or indirect sale, assignment, transfer, license, sublicense, sublease, collateral assignment, grant of a security, collateral or conditional interest, Inter-vivos transfer, testamentary disposition or other disposition of this Agreement, any interest in or right under this Agreement, or any form of ownership interest in you or the assets, revenues or income of your BUSINESS including: (1) any transfer, redemption or issuance of a legal or beneficial ownership interest in the capital stock of, or a partnership interest in, you or of any interest convertible to or exchangeable for capital stock of, or a partnership interest in, you; (2) any merger or consolidation between you and another entity, whether or not you are the surviving corporation; (3) any transfer in, or as a result of, a divorce, insolvency, corporate or partnership dissolution proceeding or otherwise by operation of law; (4) any transfer upon your death or the death of any of your Owners by will, declaration of or transfer in trust or under the laws of intestate succession; or (5) any foreclosure upon your BUSINESS or the transfer, surrender or loss by you of possession, control or management of your BUSINESS.

## 2.     <u>YOUR ORGANIZATION AND MANAGEMENT.</u>

2.1     <u>ORGANIZATIONAL DOCUMENTS.</u> If you are, or at any time become a corporation, partnership, limited liability company, or other legal entity, you and each of your Owners agree and represent that:

(1)       you are duly organized and validly existing under the laws of the state of your organization, and, if a foreign business corporation, partnership,

RJFA (3/17)

EXHIBIT 1

JBG 000122

limited liability company or other legal entity, you are duly qualified to transact business in the state in which your BUSINESS is located;

(2)    you have the authority to execute and deliver this Agreement and to perform your obligations hereunder;

(3)    your activities are restricted to those necessary solely for the development, ownership and operation of a **ROCKIN' JUMP** business in accordance with this Agreement and in accordance with any other agreements entered into with us or any of our Affiliates;

(4)    the articles or certificate of incorporation, partnership agreement or other organizational documents recite that the issuance, transfer or pledge of any direct or indirect legal or beneficial ownership interest is restricted by the terms of this Agreement; and

(5)    all certificates representing direct or indirect legal or beneficial ownership interests in you now or hereafter issued must bear a legend in conformity with applicable law reciting or referring to such restrictions.

**2.2**    **DISCLOSURE OF OWNERSHIP INTERESTS.** You and each of your Owners represents, warrants and agrees that attached **Appendix A** is current, complete and accurate. You agree that updated copies of **Appendix A** will be furnished promptly to us, so that **Appendix A** (as so revised and signed by you) is at all times current, complete and accurate. Each person who is or becomes an Owner must execute an agreement in the form we prescribe, undertaking to be bound jointly and severally by the terms of this Agreement, the current form of which is attached hereto as **Appendix B**. Each person who is or becomes an Owner must execute an agreement in the form we prescribe, undertaking to be bound by the confidentiality and non-competition covenants contained in the Agreement, the current form of which is attached hereto as **Appendix C.** Each Owner must be an individual acting in his individual capacity. In addition, if you have one or more Silent Investors, you and each of your Owners must execute the attached **Appendix D**.

**2.3**    **RESPONSIBLE PERSON/MANAGEMENT OF BUSINESS.** If you are, or at any time become, a business corporation, partnership, limited liability company or other legal entity, you must designate in **Appendix A** as the "Responsible Person" an individual approved by us who must have the authority to bind you regarding all operational decisions with respect to your **ROCKIN' JUMP** BUSINESS; and have completed our training program to our satisfaction. You (or your Responsible Person) shall exert your best efforts to the development and operation of your BUSINESS and all other **ROCKIN' JUMP** businesses you own; and absent our prior approval may not engage in any other business or activity, directly or indirectly, that requires substantial management responsibility or time commitments or otherwise may conflict with your obligations hereunder.

**EXHIBIT 1**

We shall have no responsibility, liability or obligation to any party to any such arrangement, agreement or contract, or any amendments thereto, on account of our approval thereof or otherwise, and you agree to indemnify and hold us harmless with respect thereto. You must notify us of any proposed change of the Responsible Person and receive our written approval prior to such change. If such change results from the voluntary or involuntary termination of the Responsible Person, you must submit a new proposed Responsible Person within fifteen (15) days after such termination. Neither you nor your owners will, directly or indirectly, take any actions to avoid or restrict the authority requirement for the Responsible Person. Your BUSINESS at all times must be managed by you (or your Responsible Person) or by an on-site general or assistant manager or a shift supervisor who has completed the appropriate training programs.

2.4     **CONTROL GROUP.** If you or one of your Affiliates have entered into a Multi-Unit Development Agreement with us and are entering into this Agreement pursuant thereto, and you are a business corporation, partnership, limited liability company or other legal entity, you acknowledge and agree that the Owner or group of Owners described in **Appendix A** hereof that has, directly or indirectly, 51% or more ownership interest in you and voting control over its ownership interests in you ("Control Group"), has the same ownership interest in and voting control of the entity that executed the Multi-Unit Development Agreement. Furthermore, you acknowledge and agree that we have the right to approve in advance your ownership structure.

2.5     **FACILITY ORGANIZATION.** Your BUSINESS must be staffed by at least one trained general manager and appropriate numbers of assistant managers, shift supervisors, and personnel so that all shifts are staffed by at least one assistant manager or shift supervisor, unless otherwise approved by us.

3.      **GRANT OF RIGHTS.**

3.1     **GRANT OF FRANCHISE.** You desire a franchise to own and operate a **ROCKIN' JUMP** business. Subject to the terms of and upon the conditions contained in this Agreement, we hereby grant you a franchise (the "**Franchise**") to operate a **ROCKIN' JUMP** business at the location identified on **Appendix G** (the "**Location**"), and a non-exclusive license to use the Marks and the System in the operation thereof, for a term commencing on the Effective Date and expiring on the tenth (10th) anniversary of that date ("**Initial Term**"), unless sooner terminated in accordance with Article 15 hereof and provided you comply with the requirements of Article 9.4.1 below. This Agreement grants to you a Franchise for a single **ROCKIN' JUMP** business with an exclusive territory shown on the map attached hereto as Appendix G-1 (the **"Exclusive Territory"**).

You shall have the right to choose an alternative Exclusive Territory upon our approval, provided such territory is not in conflict with any then existing territorial restrictions, or not already the subject of a Multi-Unit

EXHIBIT 1

Development Agreement, Franchise Agreement, Letter of Intent to Lease (LOI) or significant negotiations have taken place with another potential franchisee that we deem likely, in our sole discretion, to lead to such potential franchisee securing such territory. Further, in order to officially move your Exclusive Territory, you must have a fully executed LOI. We and our Affiliates have the unlimited right to compete with you and license others to compete with you outside your Exclusive Territory. You may not operate the BUSINESS from any site other than the Location without our prior written consent. If we consent to the BUSINESS's relocation, we have the right to charge you for the expenses we incur in connection with the relocation. If you sign a Multi-Unit Development Agreement ("**MUD**") with us, you will receive an Exclusive Territory for a specified geographic area, as outlined in the MUD.

3.2    <u>**OUR RESERVATION OF RIGHTS.**</u> Except as otherwise expressly provided in this Agreement, we and all of our Affiliates (and our and their respective successors and assigns, by purchase, merger, consolidation or otherwise) retain all of our rights with respect to the Marks, the System and **ROCKIN' JUMP** businesses anywhere in the world, and the right to engage in any business whatsoever, including the right to:

(1)    operate, and grant to others the right to operate, **ROCKIN' JUMP** businesses outside your Exclusive Territory at such locations and on such terms and conditions as we deem appropriate;

(2)    offer to sell, or sell and distribute, any products or services under any trade names, trademarks, service marks or trade dress, including the Marks, through any distribution channels or methods, which may include, without limitation, retail stores, wholesale, and the Internet (or any other existing or future form of electronic commerce); and

(3)    acquire, be acquired by, merge, affiliate with or engage in any transaction with other businesses (whether competitive or not), with units located anywhere or business conducted anywhere. These transactions may include arrangements involving competing businesses or outlets and dual branding or brand conversions. You must participate at your expense in any conversion as instructed by us.

4.    **LOCATION SELECTION, LEASE OR PURCHASE OF LOCATION AND LOCATION DEVELOPMENT.**

4.1    <u>**LOCATION SELECTION AND APPROVAL.**</u> You acknowledge that, following your signing this Agreement, you (with or without our assistance) will find and submit to us for our approval a Location for your BUSINESS. You acknowledge and agree that our recommendation or approval of the Location, and any information regarding the Location communicated to you regarding our

8

standard site selection criteria for **ROCKIN' JUMP** businesses, do not constitute a representation or warranty of any kind, express or implied, as to the suitability of the Location for a **ROCKIN' JUMP** business or for any other purpose. Our recommendation or approval of the Location indicates only that we believe that the Location falls within the acceptable criteria for locations that we have established as of the time of our recommendation or approval of the Location.

You acknowledge and agree that your selection of the Location is based on your own independent investigation of the suitability of the Location. We have the right to grant or withhold approval of any proposed Location in our business judgment.

4.2    **PURCHASE OR LEASE OF THE LOCATION.**  You must lease, sublease or purchase the Location within nine (9) months after signing this Agreement. Your failure to sign a lease within this timeframe constitutes grounds for immediate termination of this Agreement under Article 15.2 and the loss of your non-refundable Initial Franchise Fee. We have the right, but not the obligation, to review the business terms of any lease, sublease or purchase contract for the Location, and you agree to deliver a copy to us for our review before you sign it. You agree that any lease or sublease for the Location must, in form and substance satisfactory to us, include all of the provisions set forth on **Appendix F** attached hereto. You may not execute a lease, sublease purchase contract or any modification thereof without our approval. Our approval of the lease, sublease or purchase contract does not constitute a warranty or representation of any kind, express or implied, as to its fairness or suitability or as to your ability to comply with its terms. We do not, by virtue of approving the lease, sublease or purchase contract, assume any liability or responsibility to you or to any third parties. Such approval indicates only that we believe that the Location and certain terms of the lease, sublease or purchase contract fall within the acceptable criteria we have established as of the time of our approval. You further acknowledge that we have advised you to seek legal counsel to review and evaluate the lease. You must deliver a copy of the fully signed lease, sublease or purchase contract to us within five (5) days after its execution.

4.3    **LOCATION DEVELOPMENT.** You are solely responsible for developing the BUSINESS, for all expenses associated with it and for compliance with the requirements of any applicable federal, state or local law, code or regulation, including those concerning the Americans with Disabilities Act ("**ADA**") or similar rules governing public accommodations for persons with disabilities. We will furnish you with mandatory specifications and layouts for a **ROCKIN' JUMP** business, including requirements for dimensions, design, image, interior layout, decor, fixtures, equipment, signs, furnishings and color scheme and other suggestions. The mandatory specifications and layouts we provide will not contain the requirements of any federal, state or local laws, codes or regulations. You are obligated to have prepared, at your expense, all required construction plans and specifications to suit the shape and dimensions of the Location and to ensure that such plans and specifications comply with all applicable federal, state

**EXHIBIT 1**

or local laws, codes, regulations, ordinances, building codes and permit requirements and with lease requirements and restrictions. You acknowledge that design quality is important to us. You must submit all such modified plans and specifications, including design specifications, to us for our approval before starting to develop the Location. All final plans are subject to our approval. At our request, you must submit all revised or "as built" plans and specifications. Our review and approval of your plans is not designed to assess compliance with federal, state or local laws and regulations, including the ADA, as compliance with such laws is your sole responsibility. All development and any signage must be in accordance with the plans and specifications we have approved and must comply with all applicable laws, ordinances and local rules and regulations. We will furnish such guidance to you in developing the Location as we deem appropriate. We may periodically inspect the Location during its development. We do not, by approving your plans or specifications or inspecting the Location, assume any liability or responsibility to you or to any third parties. Such approvals and inspections shall be solely for the purpose of assuring compliance with our standards and shall not be construed as any express or implied representation or warranty that your BUSINESS complies with any applicable laws, codes or regulations (including the ADA or any other federal, state, or local law or ordinance regulating standards for the access to, use of, or modifications of buildings for any by persons whose disabilities are protected by law) or that the construction thereof is sound or free from defects. All prototype and modified plans and specifications for your BUSINESS remain our sole and exclusive property, and you may claim no interest therein. You must employ a general contractor acceptable to us. You must procure all applicable construction insurance in amounts and coverages acceptable to us. You must provide us with weekly progress reports during construction in a format acceptable to us. We have the right to visit and inspect, the site during the construction phase. Such visits shall be at our expense, except for visits made upon your request, which shall be at your expense. The requirement to complete construction of your BUSINESS includes obtaining all required construction and occupancy licenses and permits, developing the Location (including all outdoor features and landscaping of the Location, if applicable), installing all required fixtures, furnishings, equipment and signs, and doing all other things as may be required pursuant to this Agreement or by practical necessity to have your Location ready to open for business. Your BUSINESS may not be opened for business until we have notified you that your BUSINESS meets our requirements for opening. Notwithstanding anything to the contrary contained in this Article 4.3, you shall not be deemed to be in breach of this Article 4.3 if your failure to start construction, finish construction or open your BUSINESS as above provided results solely from windstorms, rains, floods, earthquakes, typhoons, mudslides, fires or other natural disasters. Any delay resulting from any of such causes shall extend performance accordingly, in whole or in part, as may be reasonable, except that no such cause, alone or in combination with other causes, shall extend performance more than ninety (90) days without our prior written consent, which consent may be withheld.

RJFA (3/17)

EAST\146514907.3

**EXHIBIT 1**

JBG 000127

4.4     **YOUR OBLIGATIONS.**  You agree, at your own expense, to do the following with respect to developing the BUSINESS at the Location:

(1)     secure all financing required to develop and operate the BUSINESS;

(2)     obtain all permits and licenses required to construct and operate the BUSINESS;

(3)     construct all required improvements to the Location and decorate the BUSINESS in compliance with plans and specifications we have approved, and which comply with all governmental requirements;

(4)     purchase or lease and install all required fixtures, furniture, equipment, furnishings and signs required for the BUSINESS; and

(5)     purchase an initial inventory of authorized and approved products, materials and supplies.

4.5     **FIXTURES, FURNISHINGS, EQUIPMENT AND SIGNS.** You agree to use in developing and operating the BUSINESS only those fixtures, furnishings, equipment (including cash registers and/or point of sale ("**POS**") systems, telecopiers and computer hardware and software) and signs that we have approved for **ROCKIN' JUMP** businesses as meeting our specifications and standards for quality, design, appearance, function and performance. You agree to place or display at the Location (interior and exterior) only such signs, emblems, lettering, logos and display materials that we approve from time to time. You agree to purchase or lease approved brands, types or models of fixtures, furnishings, equipment and signs only from suppliers we have designated or approved (which may include us and/or our Affiliates). You will pay the then-current price in effect for all such purchases you make from us and/or our Affiliates. You agree, at your own expense, to upgrade all cash registers and/or POS systems, computer hardware and software, as necessary, in order to bring the BUSINESS into compliance with our Methods of Operation. You acknowledge and agree that from time to time, we may modify the list of approved types, brands, models and/or suppliers, and you may not, after receipt of notice of such modification, reorder any type, brand or model from any supplier, which is no longer approved. If you propose to purchase any fixtures, furniture, equipment, signs or supplies of a type, brand or model, or propose to purchase from a supplier that we have not previously approved, you must notify us and submit to us such information as we may request. We may impose reasonable inspection and supervision fees on approved suppliers to cover our costs.  We and our Affiliates may receive revenue or other consideration as a result of your purchases of goods or services from us, our Affiliates, or third party suppliers.  We and our Affiliates have the right to retain any revenue that we or they receive as a result of your purchases of goods and services.

**4.6** **START-UP INVENTORY, FURNITURE, FIXTURES, SOFTWARE, EQUIPMENT AND SUPPLIES.** Subsequent to your execution of this Agreement and prior to your commencement of operations hereunder, we will give you lists of the start-up inventory, furniture, fixtures, software, equipment and supplies we require you otherwise to obtain prior to commencing operations hereunder. You will establish independent commercial relationships with our approved suppliers for specific items. You will establish independent commercial relationships with other suppliers for the goods and services for which we only provide specifications. Our list of approved suppliers and specifications for goods and services will be set forth in the Operations Manual or in other materials we give you from time to time.

**4.7** **BUSINESS COMMENCEMENT.** You agree not to commence operation of the BUSINESS until:

(1) we approve the BUSINESS as developed in accordance with our specifications and standards;

(2) preopening training has been completed by you, your Responsible Person, and/or your employees to our as provided in Article 6.1;

(3) you have given us a copy of your lease, sublease or purchase contract for the Location;

(4) the Initial Franchise Fee and all other amounts then due to us have been paid;

(5) we have been furnished with copies of all insurance policies required by this Agreement and been named as an additional insured, or such other evidence of insurance coverage and payment of premiums as we request or accept; and

(6) you have obtained all required permits, licenses and certifications for operating the BUSINESS, and the Location is in compliance with all laws, rules and regulations.

**4.8** **COMMENCEMENT DEADLINE.** You agree to commence BUSINESS operations within eighteen (18) months after the execution of this Agreement and within five (5) days after we notify you that the conditions set forth in this Article have been satisfied.

**4.9** **GRAND OPENING MARKETING.** You agree to conduct grand opening marketing for the BUSINESS. The grand opening marketing period is a minimum of 120 days immediately preceding the date that you commence regular operations at the BUSINESS, ("**Pre-Opening Marketing Period**"). You must spend a minimum of $40,000 for your pre-opening marketing obligations (the "**Grand Opening Marketing Expense**"), but we reserve the right to require a

12

higher amount up to $120,000 depending on factors related to your BUSINESS such as location, competition, densities or other factors. Such pre-opening marketing will utilize marketing and public relations programs and media and advertising materials we have approved.

4.10    **OPENING ASSISTANCE.** If you (or any of your affiliates) have not previously owned or managed a **ROCKIN' JUMP** business, we may provide you with such opening operational assistance as we deem appropriate to assist you in starting your operations, including on-site opening assistance for as scheduled by us in our discretion.

## 5.    FEES.

5.1    **INITIAL FRANCHISE FEE.** You agree to pay us a nonrecurring and nonrefundable initial franchise fee in the amount of Thirty Two Thousand Five Hundred Dollars ($32,500), that shall be due when you execute the Agreement ("Initial Franchise Fee"). The Initial Franchise Fee is non-refundable.

5.2    **ROYALTY.** You agree to pay us a nonrefundable royalty ("Royalty") per calendar month (the "Accounting Period") via EFT. The Royalty your BUSINESS will pay shall be equal to three percent (3%) of the Total Gross Revenue for the BUSINESS. We will collect the Royalty on the day of the month designated as your royalty billing day ("**Royalty Billing Day**"), pursuant to our Methods of Operation, via the EFT initiated by us or by a third party authorized by us from the designated account identified in Article 5.3 below, or by such other means as we may authorize and approve. As used in this Article 5.2, the term "**Total Gross Revenue**" is defined in Article 1.4.

5.3    **OTHER FEES.** You agree to pay us or our Affiliates such other fees that are set forth in this Agreement or that we otherwise impose, including any fees related to your required participation in the Mandatory Liability Program as described in Article 9.9. Such fees shall be due at the same time and payable in the same manner as the Royalty, unless different payment terms are expressly stated for such fees at the time they are imposed or thereafter.

5.4    **DESIGNATED ACCOUNT.** Prior to the opening of the **ROCKIN' JUMP** BUSINESS, and as a condition thereof, you shall establish a designated bank account from which we or our authorized designee shall be authorized to withdraw in any manner which we prescribe, which may include electronic funds transfer or wire transfer, any amounts due to us, our Affiliates or any Mandatory or Preferred Vendor from you under this Agreement, including, without limitation, Royalty Fees, LAF fees and NAF fees. We have the right to review your sales numbers on a daily basis. On the day designated as your Royalty Billing Day, we or our authorized designee shall calculate the Royalty Fee due for that Accounting Period and withdraw such amount and any other amounts due under this Agreement, including any advertising and marketing fees set forth under Article 10, directly from the designated account. All costs and expenses of

13

establishing and maintaining such designated account, including transaction fees and wire transfer fees, shall be paid by you. You agree to maintain at all times sufficient funds in such designated bank accounts for such withdrawals.

5.5    **INTEREST ON LATE PAYMENTS.**  All amounts which you owe us and do not pay us when due will bear interest after their due date at the lesser of: (a) the highest contract rate of interest permitted by law; or (b) eighteen (18%) percent per annum. You acknowledge that this Article does not constitute our agreement to accept any payments after they are due or our commitment to extend credit to, or otherwise finance your operation of, the BUSINESS.

5.6    **APPLICATION OF PAYMENTS.** Notwithstanding any designation you might make, we have the right to apply any of your payments to any of your past due indebtedness to us. You acknowledge and agree that we have the right to set off any amounts you or your owners owe us against any amounts we might owe you or your owners.

5.7    **AUTHORIZED EFT PAYMENT.**  You acknowledge and agree that in order to insure quality and consistency at all **ROCKIN' JUMP** businesses, we may require that you obtain goods or services from certain designated suppliers. Pursuant to our Methods of Operation, we may identify certain suppliers, that may include us, or any Affiliate, as a Mandatory Vendor or a Preferred Vendor. You hereby acknowledge and agree that in the event we receive notice from any Mandatory Vendor or Preferred Vendor that you are over sixty (60) days past due on any payment to such Vendor, and you have not provided any notice to the Vendor disputing such overdue amount prior to our receipt of notice from the Vendor concerning any such past due amount, you hereby authorize us to make payment on your behalf of any such overdue amount to such Vendor. You acknowledge and agree we may pay any such overdue amount by withdrawing from your designated bank account an amount equal to the overdue amount owed to the Vendor.

5.8    **NON-COMPLIANCE FINE.**  In the event you are found in violation of any of the terms of this Agreement beyond any applicable cure period, we may impose a fine of $250 per day for each day you remain out of compliance. If there is no cure period, the $250 per day fine shall begin the day after we give you written notice.  Nothing herein is intended to limit our rights of termination based on your violation of this Agreement.

5.9    **INSPECTION AND COMPLIANCE REIMBURSEMENT.**  You agree to reimburse us for our actual costs if, after an inspection of your ROCKIN' JUMP business, we determine (in our business judgment) that additional follow up inspections or assessments are required. Our actual costs may include (but are not necessarily limited to) travel, meal and hourly wage expenses.

6.    **TRAINING, ASSISTANCE, AND METHODS OF OPERATION.**

EAST\146514907.3

**EXHIBIT 1**

**6.1** **TRAINING.** Before the BUSINESS begins operating, we will furnish initial training on the operation of a **ROCKIN' JUMP** business to you (or, if you are a corporation, partnership, limited liability company or other entity, your Responsible Person), and up to two (2) additional Owners or employees you elect to enroll in the training program, that we approve. As of the Effective Date, initial training consists of twelve (12) working days of training for you (or your Responsible Person), and your Owners or employees to be furnished at our training location or at an operating **ROCKIN' JUMP** business and at your location. You (or your Responsible Person), and your Owners or employees are required to complete the initial training to our satisfaction. If you are an existing franchisee and you have previously completed our initial training program, you will not be required to attend the initial training program, however, we may require that certain of your employees and that any new general manager complete the initial training program. You also are required to participate in all other activities required to operate the BUSINESS. Although we will furnish initial training to you (or your Responsible Person), and up to two (2) additional Owners or employees at no additional fee or other charge, you will be responsible for all travel and living expenses and compensation which you (or your Responsible Person) and your Owners or employees incur in connection with training. If we determine that you (or your Responsible Person) are unable to complete initial training to our satisfaction, we have the right to terminate this Agreement pursuant to Article 15 hereof. As of the Effective Date we do not have plans to change the initial training, but we reserve the right to do so. If the initial training changes before you enroll in the training program you, your Owners and your employees will be required to complete the initial training that is required of franchisees at such time.

**6.2** **REFRESHER TRAINING.** We may require you (or your Responsible Person) and/or previously trained and experienced employees to attend periodic refresher training courses at such times and locations that we designate, and we may charge reasonable fees for such courses. We also may require you to pay us fees for training additional employees or your new employees hired after your BUSINESS commences operations. Currently, we charge $500 per day per trainer, plus all travel expenses if the training occurs at your location.

**6.3** **GENERAL GUIDANCE.** We may advise you from time to time regarding operating issues concerning the BUSINESS disclosed by reports you submit to us or on-site inspections we make from time to time. Such guidance may be furnished in our Operations Manual, bulletins, emails, through our company intranet or other written materials or by any electronic transmission and/or during telephone consultations and/or consultations at our office or the BUSINESS. In addition, we may furnish guidance to you with respect to:

(1) standards, specifications and operating procedures and methods utilized by the BUSINESS;

EAST\146514907.3

RJFA (3/17)

EXHIBIT 1

JBG 000132

(2)     purchasing required fixtures, furnishings, equipment, signs, products, materials and supplies;

(3)     advertising and marketing program approvals;

(4)     employee training;

(5)     administrative, bookkeeping and accounting procedures;

(6)     use of authorized and approved computer systems; and

(7)     sample or template forms or documents. **ANY SUCH SAMPLE OR TEMPLATE FORMS ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND ARE NOT INTENDED AS LEGAL ADVICE. WE DO NOT WARRANT THE COMPLETENESS, LEGALITY OR ENFORCEABILITY OF ANY DOCUMENT OR INFORMATION PROVIDED BY US. YOU SHOULD RETAIN YOUR OWN LEGAL COUNSEL TO REVIEW AND REVISE ANY SUCH DOCUMENT OR INFORMATION TO CONFORM TO ALL APPLICABLE FEDERAL, STATE AND LOCAL LAWS.**

6.4     **ON-SITE CONSULTATION AND ADDITIONAL GUIDANCE.** During the term of this Agreement, additional guidance may be provided in any of the following ways:

(1)     Internet and telephone consultation during such times as are outlined in the Operations Manual;

(2)     wholesaling services whereby we may ourselves act as an approved or designated source for products, merchandise, accessories, fixtures, furnishings, equipment, signs, etc.;

(3)     website and social media marketing assistance;

(4)     ongoing marketing programs (not collateral) to fulfill our obligations in Article 10 of this Agreement;

(5)     meetings, seminars or conferences whereby we may get together with you and other **ROCKIN' JUMP** franchisees for business or social purposes;

(6)     research and development regarding Methods of Operation; and/or

(7)     at your request, we may furnish additional guidance and assistance and, in such a case, may charge the *per diem* fees (currently $500 per day per trainer) and charges we establish from time to time. If you request, or if we require, additional or special training for your employees, all of the expenses that we incur in connection with such training, including *per*

16

*diem* charges and travel and living expenses for our personnel, will be your responsibility.

6.5     **OPERATIONS MANUAL.** During the term of this Agreement, we will allow you to borrow our then current operations manual, consisting of such materials (which includes, but is not limited to, audio tapes, videotapes, magnetic media, computer software and written materials) that we furnish to franchisees from time to time for use in operating a **ROCKIN' JUMP** business. In our discretion, we may provide you the Operations Manual in paper or electronic form. We shall also provide certain information throughout the term of this agreement from time to time in various forms, such as lists, bulletins, emails, templates and forms through our company intranet and through other written and electronic means all of which shall constitute our Operations Manual as defined in this Agreement. The information provided contains mandatory and suggested specifications, standards, operating procedures and rules that we prescribe from time to time for the operation of a **ROCKIN' JUMP** business and information relating to your other obligations under this Agreement and related agreements. You may receive various information in written or electronic form from time to time to reflect changes in the law, marketplace or our Methods of Operation. You agree to keep your copy of any bound operations manual and any information we share with you that is a part of our Methods of Operation and/or Operations Manual confidential pursuant to your confidentiality obligations set forth in this Agreement. You further agree to keep all such information secure whether hard copies located at the BUSINESS or by keeping all password protected electronic information secure. The Operations Manual and the Methods of Operation communicated to you shall be deemed to be a part of this Agreement. You acknowledge and agree that in the future, the Operations Manual and other system communications may only be available on the Internet, our intranet system or other online or computer data transfer communications. The Operations Manual and our Methods of Operations constitute confidential trade secrets and will remain our property. You agree that these requirements are reasonable and necessary to preserve the identity, reputation, value and goodwill of the system. The Operations Manual and our Methods of Operations, as amended from time to time, is intended to further the purposes of this Agreement and are specifically incorporated into this Agreement.

6.6     **COMPLIANCE WITH METHODS OF OPERATION.** You acknowledge and agree that your operation and maintenance of the BUSINESS in accordance with our Methods of Operation is essential to preserve the goodwill of the Marks and all **ROCKIN' JUMP** businesses. Therefore, at all times during the term of this Agreement, you agree to operate and maintain the BUSINESS in accordance with our Methods of Operation, as we periodically modify and supplement them during the term of this Agreement. Further, if you fail to cure any default under this Agreement that relates (in whole or in part) to the Methods of Operation, then without waiving any of our rights under Article 15 herein, we may, in our business judgment, provide you with written notice that we have temporarily

EAST\146514907.3
**EXHIBIT 1**

elected not to terminate this Agreement and allow you additional time to cure the default(s), provided that you pay to us the Non-Compliance Fee set forth in Article 5.7 above until such time you cure the default. Our collection of the Non-Compliance and temporary extension of the applicable cure period does not waive our right to require your full compliance with this Agreement.

6.7 **WORKS MADE-FOR-HIRE.** All ideas, concepts, procedures, techniques or processes concerning the **ROCKIN' JUMP** BUSINESS, whether or not protectable intellectual property and whether created by or for you or your owners or employees, must be promptly disclosed to us and will be deemed to be our sole and exclusive property, part of the System, and works made-for-hire for us. To the extent any item does not qualify as a "work made-for-hire" for us, you will assign ownership of that item, and all related rights to that item, to us and must take whatever action (including signing an assignment agreement or other documents) we request to show our ownership or to help us obtain intellectual property rights in the item.

6.8 **GENERAL CONDUCT.** You will not, and will not allow your employees to, engage in conduct that, in our sole determination, may result in or tends to (a) degrade, offend, shock or insult the community, (b) ridicule public morals or decency, or (c) prejudice us, our Affiliates, the Trademarks or the System generally. You will (and will ensure that your employees) conduct yourself with due regard to public conventions and morals.

6.9 **CYBER-EVENT/IDENTITY THEFT.** You shall use your best efforts to protect your customers and employees against a cyber-event, identity theft or theft of personal information. You shall at all times be in compliance with the Payment Card Industry Data Security Standards ("PCI Compliant").

7. **MARKS.**

7.1 **OWNERSHIP AND GOODWILL OF MARKS.** Your right to use the Marks is derived solely from this Agreement and limited to your operation of the BUSINESS pursuant to and in compliance with this Agreement and Methods of Operation, which we prescribe from time to time during its term. Your unauthorized use of the Marks will be a breach of this Agreement and an infringement of our rights in and to the Marks. You acknowledge and agree that your usage of the Marks and any goodwill established by such use will be exclusively for our and our Affiliates' benefit and that this Agreement does not confer any goodwill or other interests in the Marks upon you (other than the right to operate the BUSINESS in compliance with this Agreement). All provisions of this Agreement applicable to the Marks apply to any additional proprietary trademarks and service marks and commercial symbols we authorize you to use. You will not represent in any manner that you have any ownership in the Marks or the right to use the Marks except as provided in the Agreement and in the Operations Manual.

**EXHIBIT 1**

7.2 **LIMITATIONS ON YOUR USE OF MARKS.** You agree to use the Marks as the sole identification of the BUSINESS, except that you agree to identify yourself as the independent owner thereof in the manner we prescribe. You may not use any Marks, or any name that is confusingly similar with any Marks as part of any corporate or legal business name or as part of an Internet domain name or Internet e-mail address or with any prefix, suffix or other modifying words, terms, designs or symbols (other than logos licensed to you hereunder), or in any modified form, nor may you use any Marks in connection with the performance or sale of any unauthorized services or products or in any other manner we have not expressly authorized in writing. No Marks may be used in any advertising concerning the transfer, sale or other disposition of the BUSINESS or an ownership interest in you. You agree to display the Marks in the manner we prescribe at the BUSINESS, on supplies or materials we designate and in connection with forms and advertising and marketing materials. You agree to give such notices of trademark and service marks registrations; i.e., "®", "™", as we specify and to obtain any fictitious or assumed name registrations required under applicable law. You agree to withdraw any fictitious or assumed name registrations immediately upon termination or expiration of this Franchise Agreement.

7.3 **NOTIFICATION OF INFRINGEMENTS AND CLAIMS.** You agree to notify us immediately of any apparent infringement or challenge to your use of any Marks, or of any claim by any person of any rights in any Marks, and agree not to communicate with any person other than us, our attorneys and your attorneys in connection with any such infringement, challenge or claim. We have the right to take such action as we deem appropriate and the right to control exclusively any litigation, United States Patent and Trademark Office ("**USPTO**") proceeding or any other administrative proceeding arising out of any such infringement, challenge or claim or otherwise relating to any Marks. You agree to sign any and all instruments and documents, render such assistance and do such acts and things as, in the opinion of our attorneys, may be necessary or advisable to protect and maintain our interests in any litigation or USPTO proceeding or other proceeding or otherwise to protect and maintain our interests in the Marks.

7.4 **DISCONTINUANCE OF USE OF MARKS.** If it becomes advisable at any time for us and/or you to modify or discontinue the use of any Marks and/or use one or more additional or substitute trademarks or service marks, you agree to comply with our directions within a reasonable time after receiving notice thereof. We will not be obligated to reimburse you for any expenses or loss of revenue attributable to any modified or discontinued Marks or for any expenditures you make to promote a modified or substitute trademark or service mark.

7.5 **INDEMNIFICATION OF FRANCHISEE.** We agree to indemnify you against, and to reimburse you for, all damages for which you are held liable in any proceeding arising out of your authorized use of any Mark pursuant to and in compliance with this Agreement and, except as provided herein, for all costs you reasonably incur in defending any such claim brought against you, provided you

19

have timely notified us of such claim and provided further that you and your owners and affiliates are in compliance with this Agreement and all other agreements entered into with us or any of our Affiliates. We are entitled to prosecute, defend and/or settle any proceeding arising out of your use of any Mark pursuant to this Agreement, and, if we undertake to prosecute, defend and/or settle any such matter, we have no obligation to indemnify or reimburse you for any fees or disbursements of any legal counsel retained by you.

8.  **CONFIDENTIAL INFORMATION.**

8.1  **CONFIDENTIAL INFORMATION.**  We possess (and will continue to develop and acquire), and may disclose to you, certain confidential information (the "**Confidential Information**") relating to the development and operation of **ROCKIN' JUMP** businesses, which may include (without limitation):

(1)  location selection criteria and plans and specification for the development of **ROCKIN' JUMP** businesses;

(2)  methods, formats, specifications, standards, systems, procedures, the Operations Manual, any other proprietary materials, the sales and marketing techniques used, and knowledge of and experience in developing and operating **ROCKIN' JUMP** businesses;

(3)  sales, marketing and advertising programs and techniques for **ROCKIN' JUMP** businesses;

(4)  knowledge of specifications for and suppliers of certain fixtures, furnishings, equipment, products, materials and supplies;

(5)  knowledge of the operating results and financial performance of **ROCKIN' JUMP** businesses other than the BUSINESS.

(6)  methods of training and management relating to **ROCKIN' JUMP** businesses;

(7)  computer system and software programs used or useful in **ROCKIN' JUMP** businesses; and

(8)  any and all other information related to the BUSINESS or **ROCKIN' JUMP** businesses generally that is labeled proprietary or confidential. This includes, without limitation, all customer and membership lists and information for the BUSINESS and **ROCKIN' JUMP** businesses generally.

8.2  **FOR BUSINESS USE ONLY.**  We will disclose our Confidential Information to you solely for your use in the operation of your BUSINESS. The Confidential Information is proprietary and includes our trade secrets. During the Term and thereafter: (a) you and your Owners may not use the Confidential Information in

20

EXHIBIT 1

any other business or capacity (you and your Owners acknowledge such use is an unfair method of competition); (b) you and your Owners must exert your best efforts to maintain the confidentiality of the Confidential Information; (c) you and your Owners may not make unauthorized copies of any portion of the Confidential Information disclosed in written, electronic or other form; and (d) you and your Owners must implement all reasonable procedures we prescribe from time to time to prevent unauthorized use or disclosure of the Confidential Information, including the use of nondisclosure agreements with your Owners, officers, directors, managers, assistant managers and shift supervisors, and you and your Owners must deliver such agreements to us. At the end of the Term, you and your Owners must deliver to us all such Confidential Information in your possession. Your restrictions on disclosure and use of Confidential Information do not apply to information or techniques which are or become generally known in the trampoline park industry (other than through your own disclosure), provided you obtain our prior written consent to such disclosure or use. You acknowledge and agree that you will not acquire any interest in Confidential Information, other than the right to utilize Confidential Information disclosed to you in operating the BUSINESS during the term of this Agreement, and that the use or duplication of any Confidential Information in any other business will constitute an unfair method of competition and a violation of this Agreement.

8.3     **IDEAS, CONCEPTS, TECHNIQUES OR MATERIALS.**   All processes, ideas, concepts, methods, techniques or materials relating to a **ROCKIN' JUMP** business, whether or not constituting protectable intellectual property, and whether created by or on behalf of you or your Owners in connection with the development or operation of your BUSINESS, will be promptly disclosed to us. If we adopt any of them as part of the System, they will be deemed to be our sole and exclusive property and part of the System and deemed to be works made for hire for us. You and your Owners agree to sign whatever assignment or other documents we may request from time to time to evidence our ownership or to assist us in securing intellectual property rights in such processes, ideas, concepts, methods, techniques or materials.

9.     **ROCKIN' JUMP METHODS OF OPERATION.**

9.1     **COMPLIANCE WITH METHODS OF OPERATION.**   You acknowledge that each and every aspect of the interior and exterior appearance, layout, decor, services and operation of your BUSINESS is important to protect our reputation and goodwill and to maintain uniform operating standards under the Marks. Any required standards exist to protect our interest in the **ROCKIN' JUMP** system and the Marks, and are not for the purpose of establishing any control, or the duty to take control, over those matters that are clearly reserved to you. You agree to comply with all mandatory specifications, standards and operating procedures, as modified from time to time (whether contained in the Operations Manual or any other communication) relating to the appearance, function, cleanliness or operation of a **ROCKIN' JUMP** business, including (without limitation):

RJFA (3/17)

EXHIBIT 1

JBG 000138

(1)     design, layout, decor, appearance and lighting; periodic maintenance, cleaning, pest control and sanitation; periodic remodeling; replacement of obsolete or worn out leasehold improvements, fixtures, furnishings, equipment and signs; hardware, software and other technology, periodic painting; and use of interior and exterior signs, emblems, lettering and logos and the illumination thereof;

(2)     types, models and brands of required fixtures, furnishings, equipment, signs, materials and supplies, hardware, software and other technology;

(3)     required or authorized products and product categories and required or authorized services and service categories;

(4)     designated or approved suppliers (which may be limited to or include us) of fixtures, furnishings, equipment, signs, products, materials and supplies, hardware, software and other technology;

(5)     terms and conditions of the sale and delivery of, and terms and methods of payment for products, materials, supplies and services including direct labor, that you obtain from us, our Affiliates or others;

(6)     sales, marketing, advertising and promotional programs and materials and media used in such programs;

(7)     use and display of the Marks;

(8)     compliance with Company philosophy and mission including, without limitation, compliance with the JumpSafe® and Safe. Clean. Fun.® philosophies;

(9)     staffing levels for the BUSINESS and matters relating to managing the BUSINESS; communication to us of the identities of the BUSINESS's personnel; qualifications, training, dress and appearance for both management and hourly employees; and sale procedures and customer service;

(10)    days and hours of operation of the BUSINESS;

(11)    participation in market research and testing and product and service development programs;

(12)    acceptance of credit cards, other payment systems and check verification services;

(13)    bookkeeping, accounting, data processing and record keeping systems and forms; methods, formats, content and frequency of reports to us of sales, revenue, financial performance and condition; and furnishing tax returns and other operating and financial information to us;

EAST\146514907.3

EXHIBIT 1

(14)    types, amounts, terms and conditions of insurance coverage required to be carried for the BUSINESS and standards for underwriters of policies providing required insurance coverage; our protection and rights under such policies as an additional named insured; required or impermissible insurance contract provisions; assignment of policy rights to us; periodic verification of insurance coverage that must be furnished to us; our right to obtain insurance coverage for the BUSINESS at your expense if you fail to obtain required coverage; our right to defend claims; and similar matters relating to insured and uninsured claims;

(15)    complying with applicable laws and ASTM standards for the operation of trampoline parks; obtaining required licenses and permits; adhering to good business practices; observing high standards of honesty, integrity, fair dealing and ethical business conduct in all dealings with customers, suppliers and us; and notifying us if any action, suit or proceeding is commenced against you or the BUSINESS; and

(16)    regulation of such other aspects of the operation and maintenance of the BUSINESS, including but not limited to maximum and minimum prices charged for products and services offered through the BUSINESS, that we determine from time to time to be useful to preserve or enhance the efficient operation, image or goodwill of the Marks and **ROCKIN' JUMP** businesses.

**9.2**    <u>**PROVISIONS OF THIS AGREEMENT.**</u>  You agree that the Methods of Operation prescribed from time to time in the Operations Manual, or otherwise communicated to you in writing or other tangible form, constitute provisions of this Agreement as if fully set forth herein. All references to this Agreement include the Operations Manual and all Methods of Operation as periodically modified.

**9.3**    <u>**MODIFICATION OF METHODS OF OPERATION.**</u>  We may periodically modify Methods of Operation, which may accommodate regional or local variations as we determine, and any such modifications may obligate you to invest additional capital in the BUSINESS ("**Capital Modifications**") and/or incur higher operating costs; provided, however, that such modifications will not alter your fundamental status and rights under this Agreement. We will not obligate you to make any Capital Modifications when such investment cannot, in our reasonable judgment, be amortized during the remaining term of this Agreement, unless we agree to extend the term of this Agreement so that such additional investment, in our reasonable judgment, may be amortized, or unless such investment is necessary in order to comply with applicable laws.

**9.4**    <u>**CONDITION OF YOUR BUSINESS.**</u>  You must maintain your BUSINESS's condition and appearance so that it is attractive, clean and efficiently operated in accordance with the Operations Manual. You agree to maintain your BUSINESS's condition and appearance and to make such modifications and

23

additions to its layout, decor, operations, and general theme as we require from time to time, including replacement of worn-out or obsolete fixtures, equipment, furniture, and signs, repair of the interior and exterior and appurtenant parking areas, and periodic cleaning and redecorating. If at any time the general state of repair, appearance or cleanliness of your BUSINESS, or its fixtures, equipment, furniture, or signs, does not meet our standards, we may notify you and specify the action you must take to correct such deficiency. If, within ten (10) days after receiving such notice, you fail or refuse to initiate and thereafter continue in good faith and with due diligence a *bona fide* program to complete such required maintenance, we have the right (in addition to our rights under Article 13), but not the obligation, to enter the Location and do such maintenance on your behalf and at your expense. You must promptly reimburse us for such expenses.

(1)     You must periodically re-equip, upgrade and/or remodel your BUSINESS pursuant to our plans and specifications, provided, however, that, with the exception of signage, we will not require substantial remodeling more often than every four (4) years during the Term. In addition, on or about the tenth (10th) anniversary of the Effective Date, we have the right, in our business judgment, to require that you fully remodel and/or expand the BUSINESS, add or replace improvements, equipment and signs and otherwise modify the BUSINESS as we require to bring it into compliance with specifications and standards then applicable for **ROCKIN' JUMP** businesses, or if you are unable to maintain possession of the Location, or if in our judgment the BUSINESS should be relocated, you must secure substitute premises we approve, develop such premises in compliance with specifications and standards then applicable for **ROCKIN' JUMP** businesses and continue to operate the BUSINESS at the Location until operations are transferred to the substitute premises.

(2)     If your BUSINESS is damaged or destroyed by fire or other casualty, you must initiate within thirty (30) days (and continue until completion) all repairs or reconstruction to restore your BUSINESS to its original condition. If, in our reasonable judgment, the damage or destruction is of such a nature that it is feasible, without incurring substantial additional costs, to repair or reconstruct your BUSINESS in accordance with the then-standard **ROCKIN' JUMP** layout and decor specifications, we may require you to repair or reconstruct your BUSINESS in accordance with those specifications. You may not make any alterations to your BUSINESS, nor any replacements, relocations or alterations of fixtures, equipment, furniture or signs, without our written approval. We have the right at your expense to rectify any replacements, relocations or alterations not previously approved by us.

**9.5**     **UNIFORM IMAGE.**  You agree that your BUSINESS will offer for sale such services, products, and merchandise related to the **ROCKIN' JUMP** concept that we determine from time to time to be appropriate for your BUSINESS. You further agree that your BUSINESS will not, without our written approval, offer

RJFA (3/17)

EAST\146514907.3

EXHIBIT 1

JBG  000141

any services or products (including promotional items) not then authorized by us. Your BUSINESS may not be used for any purpose, other than the operation of a **ROCKIN' JUMP** business in compliance with this Agreement. You agree that your BUSINESS will offer courteous and efficient service and a pleasant ambiance, consistent with your acknowledgements in Article 1.2. hereof. You may not install or operate any video, arcade, lottery games or games of chance. All such products are strictly prohibited from your **ROCKIN' JUMP** BUSINESS.

9.6  **PURCHASE OF OTHER PRODUCTS.**  You acknowledge and agree that the reputation and goodwill of **ROCKIN' JUMP** businesses are based on, and can be maintained only by, the sale of distinctive high quality services and ancillary merchandise. Therefore, you agree that your BUSINESS will use and/or offer for sale only such services, merchandise, uniforms, forms, labels and other supplies that conform to our specifications and quality standards and/or are purchased from suppliers approved by us (which may include us and/or any of our Affiliates). You acknowledge that we or our Affiliate are and may be the sole supplier for trampoline equipment or other products. We may modify the list of approved brands and/or suppliers from time to time. After notice of such modification, you may not re-order any brand or reorder from any supplier which is no longer approved. If you propose to use any brand and/or supplier which is not then approved by us, you must first notify us and submit sufficient information, specifications and samples concerning such brand and/or supplier so that we can decide whether such brand complies with our specifications and standards and/or such supplier meets our approved supplier criteria. We have the right to charge reasonable fees to cover our costs. We will notify you of our decision within a reasonable period of time. We may prescribe procedures for the submission of requests for approval and impose obligations on suppliers, which we may require to be incorporated in a written agreement. We may impose limits on the number of suppliers and/or brands for any of the foregoing items including designating us or an Affiliate as a sole supplier. You must maintain at all times an inventory of approved merchandise related to the **ROCKIN' JUMP** concept sufficient in quantity, quality and variety to realize your BUSINESS's full potential. We may conduct market research to determine consumer trends and salability of new services and products. You agree to cooperate by participating in our market research programs; by test marketing new services and merchandise in your BUSINESS and providing us timely reports and other relevant information regarding such market research. You must purchase a reasonable quantity of such test products and make a reasonable effort to sell them.

9.7  **COMPLIANCE WITH LAWS.**  You must maintain in force in your name all required license permits and certificates relating to the operation of your BUSINESS. You must operate your BUSINESS in full compliance with all applicable laws, ordinances and regulations. You must notify us in writing immediately upon the commencement of any legal or administrative action, or the issuance of an order of any court, agency or other governmental instrumentality,

EAST\146514907.3
EXHIBIT 1

RJFA (3/17)

JBG 000142

which may adversely affect the development, occupancy or operation of your BUSINESS or your financial condition; or the delivery of any notice of violation or alleged violation of any law, ordinance or regulation, including those relating to health or sanitation at your BUSINESS. All of your advertising and promotion must be completely factual and must conform to the highest standards of ethical advertising. In all dealings with us, as well as your customers, suppliers, lessors and the public, you must adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct. You agree to refrain from any business or advertising practice which may be injurious to our business, to the business of other **ROCKIN' JUMP** businesses or to the goodwill associated with the Marks. You agree to keep up to date on the developing ASTM standards for the safe operations of trampoline parks.

**9.8**     **PERSONNEL.**   You are solely responsible for all employment decisions with respect to your personnel, including hiring, firing, compensation, training, supervision and discipline, and regardless whether you receive advice from us on any of these subjects.  Any training that we provide to your employees will be limited to teaching them brand standards and about the System.  You may not recruit or hire any person who is an employee of ours or of any **ROCKIN' JUMP** business operated by us, our Affiliates or another franchisee of ours without obtaining the employer's consent, which consent may be withheld for any reason. Likewise, we may not recruit or hire any person who is an employee of yours or your affiliates without obtaining the employer's consent, which consent may be withheld for any reason.

**9.9**     **INSURANCE.**   We and our affiliates have established a mandatory program for insurance coverage and risk management (as amended from time to time in our sole discretion, the **"Mandatory Liability Program"**).  You agree to participate in the Mandatory Liability Program and any subsequent or additional mandatory insurance program we or our affiliates may create.  You also agree to pay all fees related to such programs, which we or our affiliates may determine in our or their sole discretion and may include, without limitation, ongoing participation fees and claims-related fees and expenses.  We and our affiliates may use or distribute any fees that we or they collect from you that are related to the Mandatory Liability Program for any purpose, without limitation.  Unless included in the Mandatory Liability Program or any other mandatory insurance program you must procure and maintain in force from an insurance company with an "A" or better rating by AM Best and a Financial Rating of "VII" or better primary insurance coverage as follows:     commercial     general     liability     insurance     (including completed/operations/product liability, and coverage for any consolidated claims against us and our Affiliates); Special Form property insurance, including fire and extended coverage, vandalism and malicious mischief insurance for 100% of the replacement value of your BUSINESS and its contents; and such other insurance policies, such as business interruption insurance, professional liability insurance, abuse and molestation insurance, automobile insurance, unemployment insurance, excess umbrella insurance and workers' compensation insurance (with a broad

26

form all-states endorsement) as we may determine periodically and as required by law.  We may from time to time require that you obtain the required insurance coverage from approved vendors, which may include us or our Affiliates.  For any interruption in the operation of the BUSINESS, you shall continue to pay us, during such period of interruption, continuing royalty fees based on the average monthly royalty fees paid by you during the twelve (12) months immediately preceding the period of interruption, if you have business interruption insurance. All insurance policies must be approved by us (as set forth in the Operations Manual or otherwise in writing); contain such types and minimum amounts of coverage, exclusions and maximum deductibles as we prescribe from time to time in our Operations Manual or otherwise in writing from time to time; name us and our Affiliates, including but not limited to Rockin' Jump Corporate, LLC and Rockin' Jump Holdings, LLC, as additional insureds; provide for thirty (30) days prior written notice to us of any material modification, cancellation or expiration of such policy; and include such other provisions as we may require from time to time. You must furnish us with a Certificate of Insurance on an annual basis. Excess and Surplus Lines insurance is specifically prohibited. If you fail or refuse to maintain any required insurance coverage, including failing to pay the fees for the Mandatory Liability Program or for any mandatory insurance program provided by us, our Affiliate or any approved vendor, or to furnish satisfactory evidence thereof, we, at our option and in addition to our other rights and remedies hereunder, may obtain such insurance coverage on your behalf. If we do so, you must fully cooperate with us in our effort to obtain such insurance policies and pay us any costs and premiums we incur. Your obligation to maintain insurance coverage is not diminished in any manner by reason of any separate insurance we may choose to maintain, nor does it relieve you of your indemnification obligations under this Agreement.  The continuation of the Mandatory Liability Program is dependent on many factors and nothing herein shall constitute a guarantee or promise that we will continue to offer the Mandatory Liability Program, or any particular coverage or service included therein, that the any fees related to the program will remain the same, or that the Mandatory Liability Program will continue being offered during the term of this Agreement or for any other time period.

**9.10**  **QUALITY CONTROL.**  We have the right to establish "quality control" programs, such as a "mystery shopper" or "secret shopper" program, a customer satisfaction measurement program, and/or a "customer intercept" program, to ensure the highest quality of service and products in all **ROCKIN' JUMP** businesses. You shall participate in any such quality control programs, and bear your pro-rata share, as determined by us, of the costs of any such program.

**9.11**  **PRICING POLICIES.**  We reserve the right to establish prices for the products and services you sell, both minimum and maximum, subject to applicable law.

**9.12**  **MANDATORY SECURITY CAMERAS.**  As part of our JumpSafe® policies and procedures and our quality control efforts you must install security cameras to our specifications.  You must also ensure that your security camera system is

operational at all times and that we have independent access to your security system at all times.

9.13 **RECIPROCAL MEMBERSHIP/COUPONS.** You must participate fully in any reciprocal access program or company discount coupons that we may design or implement. You agree and acknowledge that any reciprocal usage by Rockin' Jump members of other franchisees and us or when a person redeems any discounted coupons at your BUSINESS, you are not entitled to reimbursement for membership fees or the cost of goods or services provided to the member as a reciprocal access benefit.

9.14 **LIMITATIONS ON POINT-OF-SALE SYSTEM AND FINES.** While the day-to-day operation of your BUSINESS and the safety and wellbeing of your customers is your responsibility, we reserve the right to turn off your access to the point-of-sale system, or limit the number of jumpers who can simultaneously be entered through the point-of-sale system, if we believe the safety or wellbeing of any of your customers are in danger, or if there are other significant quality breaches in the operation of your BUSINESS. Any such business interruption shall be without liability to us, and we will not be responsible for any lost profits or other damages you sustain. Furthermore, for any jumper who you do not obtain a waiver prior to them using the trampolines or other attractions at your BUSINESS, we have the right to charge you a fee of Two Thousand Five Hundred dollars ($2,500).

## 10. MARKETING.

10.1 **NATIONAL ADVERTISING.** Recognizing the value of advertising and marketing to the goodwill and public image of **ROCKIN' JUMP** businesses and the **ROCKIN' JUMP** brand, we have established and administer a National Advertising Fund ("**NAF**") for the creation and development of marketing, advertising and related programs and materials, including electronic, print and Internet media as well as the planning and purchasing of national and/or regional network advertising. You agree to contribute to the NAF such amounts that we prescribe from time to time, not to exceed one (1%) percent of the EFT Dues Draft (the "**Ad Fee**"), payable monthly in the same manner as the Royalty due hereunder. We reserve the right to change the one (1%) percent maximum limit on NAF contributions (as well as the maximum limit on Local Advertising Funds contributions) in the future by gaining an approval vote by either (i) sixty six (66%) percent of all then existing company and franchised **ROCKIN' JUMP** businesses or (ii) fifty one (51%) percent of all then existing franchised **ROCKIN' JUMP** businesses. Voting will be accomplished through a system of one vote per eligible **ROCKIN' JUMP** business. We will direct all programs financed by the NAF and retain the right to determine the creative concepts materials and endorsements used therein and the geographic market and media placement and allocation thereof. You agree that the NAF may be used to pay the costs researching, developing, administering and preparing national, regional, point of sale and local direct sales advertising and marketing strategy materials for

28

EAST\146514907.3
**EXHIBIT 1**
JBG 000145

use by the **ROCKIN' JUMP** brand and businesses, including, without limitation preparing and producing video, audio and written advertising materials; website design, development and updating; electronic advertising efforts, including search engine optimization and social media networks and related platforms; administering regional and multiregional advertising programs, including, without limitation, purchasing direct mail and other media advertising; administrative and other costs associated with all NAF efforts; and employing advertising, promotion and marketing agencies to assist therewith and supporting public relations, market research and other advertising promotion and marketing activities and amounts expended pursuant to Article 10.2. below. All payments, plus income earned therefrom, shall be used exclusively for the above-stated purposes, and shall not be used to defray any of our general operating expenses, except for reasonable salaries, administrative costs, travel expenses, overhead, and similar expenses we may incur in activities related to the administration of the NAF and all costs of development and preparing national, regional, point of sale, and local advertising materials for use within the **ROCKIN' JUMP** System. The NAF will furnish you with samples of advertising, marketing formats, promotional formats and other materials at no additional cost to you when we deem appropriate. Multiple copies of such materials will be furnished to you at your direct cost of producing them plus any related shipping handling and storage charges. We may, at our sole discretion, set up an advisory council to advise us on the operation of the NAF and spending of the Ad Fee (**"NAFAC"**). NAFAC will not have any decision making authority and will be constituted, modified and dissolved by us, in our sole discretion.

10.2 **ACCOUNTING.** The NAF will be accounted for separately from our other funds and will not be used to defray any of our general operating expenses, except for such reasonable salaries, administrative costs, travel expenses and overhead as we may incur in activities related to the administration of the NAF and its programs including, without limitation, conducting market research, preparing advertising promotion and marketing materials, and collecting and accounting for contributions to the NAF. The NAF will have the right to negotiate and retain any commissions or marketing payments received from suppliers of any marketing or other materials or products. We may spend, on behalf of the NAF, in any fiscal year, an amount that is greater or less than the aggregate contribution of all ROCKIN' JUMP businesses to the NAF in that year and the NAF may borrow from us or others to cover deficits or invest any surplus for future use. All interest earned on monies contributed to the NAF will be used to pay advertising costs before other assets of the NAF are expended. We will prepare an annual statement of monies collected and costs incurred by the NAF and furnish the statement to you upon written request. We have the right to cause the NAF to be incorporated or operated through a separate entity at such time as we deem appropriate and such successor entity will have all of the rights and duties specified herein.

10.3 **PROPORTIONALITY.** You acknowledge that the NAF is intended to maximize recognition of the Marks and patronage of **ROCKIN' JUMP**

businesses. Although we will endeavor to utilize the NAF to develop advertising and marketing materials and programs and to place advertising that will benefit all **ROCKIN' JUMP** businesses, we undertake no obligation to ensure that expenditures by the NAF in or effecting any geographic area are proportionate or equivalent to the contributions to the NAF by **ROCKIN' JUMP** businesses operating in that geographic area. Nor are we under any obligation to ensure that any **ROCKIN' JUMP** business will benefit directly or in proportion to its NAF contributions paid to the NAF from the development of advertising and marketing materials or the placement of advertising. Except as expressly provided in this Article, we assume no direct or indirect liability or obligation to you with respect to collecting amounts due to, or maintaining, directing or administering the NAF. We do not act as trustee or in any other fiduciary capacity with respect to the NAF.

10.4   **DEFERRALS OR REDUCTIONS.**   We reserve the right to defer or reduce contributions of a **ROCKIN' JUMP** business franchisee and, upon thirty (30) days' prior written notice to you, to reduce or suspend your payment of contributions to the NAF and suspend operations of the NAF for one or more periods of any length and to terminate (and if terminated to reinstate) the NAF. If the NAF is terminated, all unspent monies on the date of termination will be distributed to our franchisees in proportion to their respective contributions to the NAF during the preceding three (3) month period, and amounts required to be paid pursuant to Article 10.1. above shall be added to amounts required to be expended pursuant to Article 10.5. below.

10.5   **LOCAL ADVERTISING.**   In addition to the contributions you pay to the NAF and the Pre-Opening Marketing Expense, you agree to spend 5% per month of your total gross revenue for your BUSINESS for locally advertising and promoting your BUSINESS, except that you agree to spend the greater of $10,000 per month and 5% of the total gross revenue for the first 4 months that your ROCKIN' JUMP business is open. These amounts spent on local advertising and promotion will be designated as Local Advertising Funds ("**LAF**"). At our request, you shall furnish us with copies of invoices and other documentation evidencing your compliance with this Article 10.5. If, in our business judgment we determine that you are under-performing or not spending the LAF on appropriate media placement, we may collect all or part of the LAF from you and administer it on your behalf. Moreover, if we determine, at some later date, that you have spent an amount less than two percent (2%) of your total gross during the then most recently completed four (4) consecutive fiscal months for locally advertising and promoting your BUSINESS, we may collect LAF contributions from you directly. We may collect all or part of the LAF from you and other franchisees if, in our business judgment, we determine such conduct is appropriate. We shall provide you with not less than thirty (30) days' notice of any determination by us which changes the amount of the LAF you must spend or the method of its expenditure. LAF contributions will be payable on the first business day following the immediately preceding Accounting Period together

with the Royalty Fees due hereunder. Said funds may be electronically drafted from the designated account referred to in Article 5.5. hereof. The LAF monies will be used to pay for the cost of implementing local marketing plans developed by you and approved by us or, if we collect LAF contributions from you, to reimburse you (up to an amount not to exceed the LAF contributions so collected) for the costs incurred by you in implementing local marketing plans developed by you and approved by us. For these purposes, advertising expenditures include: (a) amounts contributed to advertising cooperatives; and (b) amounts spent by you for advertising media, such as television, radio, Internet, newspaper, billboards, posters, direct mail, collateral and promotional items, advertising on public vehicles (transit and aerial) and, if not provided by us, cost of producing approved materials necessary to participate in these media. Advertising expenditures do not include amounts spent for items which we, in our reasonable judgment, deem inappropriate for meeting the minimum advertising requirement, including permanent on-premises signs, lighting, personnel salaries or administrative costs, transportation vehicles (even though such vehicles may display the Marks), Yellow Pages advertising, discounts, free offers and employee incentive programs. You must submit to us for our prior approval, a marketing plan and samples of all advertising and promotional materials not prepared or previously approved by us and which vary from our standard advertising and promotional materials. You may not use any advertising or promotional materials that we have not approved. If you elect to work with an advertising agency, you must obtain our written approval of such advertising agency before you sign any contracts or share any Confidential Information with the advertising agency.

10.6 **<u>ADVERTISING COOPERATIVES.</u>** We have the right to establish or approve local and/or regional advertising cooperatives for **ROCKIN' JUMP** businesses in your local or regional areas, covering such geographical areas as we may designate from time to time. You must participate in any such cooperative and its programs and abide by its by-laws. If your BUSINESS is within the territory of an existing Cooperative at the time your BUSINESS opens for business, you agree to immediately become a member of the Cooperative. If a Cooperative applicable to your BUSINESS is established during the term of this Agreement, you agree to become a member no later than thirty (30) days after the date approved by us for the Cooperative to commence operation. The following provisions shall apply to each Cooperative:

(1) Each Cooperative shall utilize a voting system of one vote per one eligible ROCKIN' JUMP business.

(2) Each Cooperative shall be organized and governed in a form and manner, and shall commence operations on a date, approved in advance by us in writing. No changes in the by-laws or other governing documents of a Cooperative shall be made without our prior written consent.

(3) Each Cooperative shall be organized for the exclusive purpose of administering advertising programs and developing, subject to our

31

approval, promotional materials for use by the members in the Cooperative.

(4) No advertising or promotional plans or materials may be used by a Cooperative or furnished to its members without prior approval by us pursuant to Article 10.6.(6). below.

(5) You and each other member of the Cooperative shall contribute to the Cooperative, using a collection structure selected and established by us, the amount determined in accordance with the Cooperative's by-laws. Any ROCKIN' JUMP businesses owned by us or any of our Affiliates located in such designated local or regional area(s) will contribute to the Cooperative on the same basis. Contributions to such local and/or regional advertising cooperatives are credited towards the advertising expenditures required by Article 10.5.; however, if we provide you and your Cooperative ninety (90) days' notice of a special promotion, including any regional promotions, you must participate in such promotion and pay to us any special promotion advertising fees assessed in connection therewith, beginning on the effective date of such notice and continuing until such special promotion is concluded. Any such special promotion advertising fees shall be in addition to, and not credited towards, the other advertising expenditures and commitments required of you by this Article 10.

(6) All advertising and promotion by you and the Cooperatives shall be in such media and of such type and format as we may approve, shall be conducted in a dignified manner, and shall conform to such standards and requirements as we may specify. You or the Cooperative shall submit written samples of all proposed advertising and promotional plans and materials to us for our approval (except with respect to prices to be charged) at least thirty (30) days before their intended use, unless such plans and materials were prepared by us or have been approved by us within the previous twelve (12) months. Proposed advertising plans or materials shall be deemed to have been approved if they have not been disapproved by us within fifteen (15) days after their receipt by us.

(7) At our request, you shall furnish us with copies of such information and documentation evidencing your Cooperative contributions as we may require in order to evidence your compliance with Article 10.6.

10.7 **COMMUNITY MARKETING PROGRAMS.** You must participate in and contribute funds to our guerrilla marketing programs and campaigns that we develop and administer from time to time in our Operations Manual, Methods of Operation or other communications with you. Community marketing may include participation in community events, street fairs, seasonal events and festivals, farmers markets and sponsorships of adult and children's sports teams. You must also sponsor local fundraising events by making your park available as a venue and revenue sharing programs.

EXHIBIT 1

**10.8** **PARTICIPATION IN INTERNET WEB SITE OR OTHER ON-LINE COMMUNICATIONS.** You must have Internet access and an e-mail address. You will use an e-mail address to send and receive e-mail and attachments on the Internet. We will provide you with five (5) unique "Rockin' Jump" email addresses. You may be required to invest in and implement new technology initiatives at your own expense, which may include, but will not be limited to, the acceptance of credit and debit cards, monitors, music, Internet TV broadcast, software management applications, surveillance system, e-learning, and software applications designed to better manage business functions and control costs. We may designate the supplier you use for any goods and services associated with these initiatives. Further, you must, at your expense, participate in the ROCKIN' JUMP web site on the internet or other on-line communications, including an intranet system we may develop in the future unless we provide otherwise. You may not separately register any domain name or operate any web site containing any of the Marks without our written approval. We determine the content and use of the web site and have the sole right to establish the rules under which franchisees may or must participate in the web site or separately use the internet or other on-line communications. We retain all rights relating to the ROCKIN' JUMP web site and may alter or terminate the web site. Your general conduct on the web site or other authorized on-line communications, and specifically your use of the Marks or any advertising on the web site or other authorized on-line communications (including the domain name and any other Marks we may develop as a result of participation in the web site or other on-line communications), is subject to the provisions of this Agreement and the related standards and restrictions we specify from time to time in the Methods of Operation. You may not use, reference or otherwise promote the Marks or System in connection with any current or future form of social media networks or platforms, including, without limitation, Facebook, Twitter, LinkedIn, Yelp and so on without our approval of such materials.

In the event that you use or download any unauthorized software, you shall be liable for all damages and problems caused by the unauthorized software in addition to the other remedies provided under this Agreement. You acknowledge that certain information obtained through your participation in the ROCKIN' JUMP web site may be considered Confidential Information, including access codes and identification codes. Your right to participate in the ROCKIN' JUMP web site or any intranet system we may develop or otherwise use the Marks or System on the internet or other on-line communicators terminates when this Agreement expires or terminates.

**10.9** **TRUTHFUL ADVERTISING, MARKETING AND PROMOTION.** You agree that any advertising, promotion and marketing you conduct will be completely clear and factual and not misleading and conform to the highest standards of ethical marketing and the promotion policies which we prescribe from time to time. Samples of all advertising, promotional and marketing materials which we have not prepared or previously approved must be submitted

RJFA (3/17)

EAST\146514907.3

JBG 000150

**EXHIBIT 1**

to us for approval before you use them. If you do not receive written disapproval within fifteen (15) days after our receipt of such materials, we will be deemed to have given the required approval. You may not use any advertising or promotional materials that we have disapproved. We own the copyrights to anything so submitted, whether approved by us or not.

**11.    RECORDS, REPORTS AND FINANCIAL STATEMENTS.**

**11.1    RECORDS.**  You agree to establish and maintain at your own expense a bookkeeping, accounting and record keeping system conforming to the requirements and formats we prescribe from time to time. You agree to prepare and to maintain for three (3) years complete and accurate books, records (including invoices and records relating to your advertising expenditures) and accounts (using our then-current standard chart of accounts) for your BUSINESS, copies of your sales tax returns and such portions of your state and federal income tax returns as relate to your BUSINESS. All such books and records shall be kept at your principal address indicated on the first page of this Agreement, unless we otherwise approve. You must record all sales on computer-based cash registers which are fully compatible with our computer system and which include an information interface capability to communicate electronically with our computer system. You agree to purchase or lease, at your expense, such computer hardware and software, required dedicated telephone and power lines, modems, printers, and other computer-related accessories and peripheral equipment as we may specify, for the purpose of, among other functions, recording financial and customer data and communicating with us. We may require you to use proprietary software and any other computer systems which we may prescribe from time to time and you agree to execute such agreements as we may require in connection therewith. You must provide such assistance as may be required to connect your computer system with our computer system. We have the right, without prior notice to you, to retrieve such data and information from your computer system as we deem necessary or desirable, including the right to obtain such information from vendors (e.g., CenterEdge, Shift Planner), and you agree to fully cooperate with such efforts. All data pertaining to your BUSINESS, and all data you create or collect in connection with the System, or in connection with your operation of the BUSINESS (including without limitation data pertaining to or otherwise concerning your members) or otherwise provided by you (including, without limitation, data uploaded to, or downloaded from your computer system) is and will be owned exclusively by us, and we will have the right to use such data in any manner that we deem appropriate without compensation to you. We hereby license use of such data back to you for the term of this Agreement, at no additional cost, solely for your use in connection with the BUSINESS conducted under this Agreement. In view of the contemplated interconnection of computer systems and the necessity that such systems be compatible with each other, you agree that you will comply strictly with our standards and specifications for all items associated with your computer systems. To ensure full operational efficiency and optimum communication capability among computer systems, you

agree, at your expense, to keep your computer systems in good maintenance and repair, and to promptly install such additions, changes, modifications, substitutions or replacements to hardware, software, telephone and power lines, and other computer-related facilities, as we direct.

**11.2** **PERIODIC REPORTS.** You must furnish us:

(1) within thirty (30) days after the end of each fiscal quarter, a quarterly balance sheet and income statement and statement of cash flow of your BUSINESS for such quarter, reflecting any adjustments and accruals;

(2) within ninety (90) days after the end of each fiscal year, a year-end balance sheet and income statement and statement of cash flow of your BUSINESS for such year, reflecting all year-end adjustments and accruals; and

(3) within thirty (30) days of our request, such other information as we may require from time to time, including sales data and labor cost reports and sales and income tax statements. All such reports shall use our then-current standard chart of accounts.

**11.3** **VERIFICATION.** You agree to verify and sign each report and financial statement in the manner we prescribe. We reserve the right to require that your annual financial statements be audited, at your expense, by an independent certified public accountant approved by us. We reserve the right to publish or disclose information that we obtain under this Article in any data compilations, collections, or aggregations that we deem appropriate so long as we do not disclose information relating to performance of your individual BUSINESS, unless such disclosure is required by law or order of a court. Moreover, we reserve the right, as often as we deem appropriate, including on a daily basis, to access the computer systems that you are required to maintain in connection with the operation of the BUSINESS and to retrieve all information relating to the BUSINESS's operations.

**12.** **INSPECTIONS AND AUDITS.**

**12.1** **OUR RIGHT TO INSPECT THE BUSINESS.** To determine whether you and the BUSINESS are complying with this Agreement and Methods of Operation, we and our designated agents have the right at any time during your regular business hours, and without prior notice to you, to:

(1) inspect the BUSINESS;

(2) observe, photograph and videotape the operations of the BUSINESS for such consecutive or intermittent periods as we deem necessary;

**EXHIBIT 1**

(3)    remove samples of any products, materials or supplies for testing and analysis;

(4)    interview personnel and customers of the BUSINESS;

(5)    inspect and copy any books, records (whether electronic or hard copy) and documents relating to your operation of the BUSINESS, including member and membership information;

(6)    retrieve such data and information from your computer system or computer systems which are licensed by you, such as the POS and reservations platform (currently CenterEdge) or Shift Planner, including obtaining such information from third parties or vendors; and

(7)    retrieve such data and information from your security camera system or computer systems including obtaining such information from third parties or vendors.

**12.2**    **COOPERATION.**  You agree to cooperate with us fully in connection with any such inspections, observations, photographing, videotaping, product removal and interviews. You agree to present to your customers such evaluation forms that we periodically prescribe and to participate and/or request your customers to participate in any surveys performed by us or on our behalf.

**12.3**    **OUR RIGHT TO AUDIT.**  We have the right at any time during your business hours, and without prior notice to you, to inspect and audit, or cause to be inspected and audited, your (if you are a corporation, partnership, limited liability company or other entity) and the BUSINESS's business, bookkeeping and accounting records, sales and income tax records and returns and other records. You agree to cooperate fully with our representatives and independent accountants we hire to conduct any such inspection or audit. In the event such inspection or audit is made necessary by your failure to furnish reports, supporting records or other information as herein required, or to furnish such items on a timely basis, you agree to reimburse us for the reasonable cost of such inspection or audit, including, without limitation, the charges of attorneys and independent accountants and the travel expenses, room and board and compensation of our employees. In the event an inspection or audit reveals that any payments have been understated in any report to us, then you shall immediately pay to us the amount understated upon demand, in addition to interest from the date such amount was due until paid, at the highest contract rate of interest permitted by law. If an inspection or audit discloses an understatement in any report of two (2%) percent or more, you shall, in addition to repayment of monies owed with interest, reimburse us for any and all costs and expenses connected with the inspection or audit, including, without limitation, the charges of attorneys and independent accountants and the travel expenses, room and board and compensation of our employees. The foregoing remedies are in addition to our other remedies and rights under this Agreement and applicable law.

13. **TRANSFER.**

13.1 **BY US.**  We have the right to sell or assign, in whole or in part, our interests in this Agreement, and any such sale or assignment will inure to the benefit of any assignee or other legal successor to our interests herein.

13.2 **BY YOU.**  You understand and acknowledge that the rights and duties created by this Agreement are personal to you (or, if you are a corporation, partnership, limited liability company or other entity, to your Owners) and that we have granted the Franchise to you in reliance upon our perceptions of your (or your Owners') individual or collective character, skill, aptitude, attitude, business ability, acumen and financial capacity. Accordingly, neither this Agreement (or any interest therein) nor any ownership or other interest in you or the BUSINESS, including any arrangement whereby you sell or pledge accounts receivable, EFT, or any other assets of the BUSINESS, may be transferred without our prior written approval. Any Transfer without such approval constitutes a breach of this Agreement and is void and of no effect.

13.3 **CONDITIONS FOR APPROVAL OF TRANSFER.**  If you (and your Owners) are in full compliance with this Agreement and the conditions of this Article 13.3 are met, we will not unreasonably withhold our consent to Transfer. The proposed transferee and its direct and indirect owners must be individuals of good moral character and otherwise meet our then applicable standards for **ROCKIN' JUMP** business franchisees.  A Transfer of ownership, possession or control of the BUSINESS may be made only in conjunction with a Transfer of this Agreement. If the Transfer is of this Agreement or a controlling interest in you, or is one of a series of Transfers which in the aggregate constitute the Transfer of this Agreement or a controlling interest in you, all of the following conditions must be met prior to or concurrently with the effective date of the Transfer:

(1) the transferee has the moral character, aptitude, attitude, experience, references, acumen and financial capacity to operate the BUSINESS, and the proposed transferee may not be an entity, or be affiliated with an entity, that is required to comply with reporting and information requirements of the Securities Exchange Act of 1934, as amended;

(2) you have paid all Royalties, Ad Fees, amounts owed for purchases from us and all other amounts owed to us or to third party creditors and have submitted all required reports and statements;

(3) the transferee (or its Responsible Person) and its managers, shift supervisors and personnel must have completed our initial training program or must be currently certified by us to operate and/or manage a **ROCKIN' JUMP** business to our satisfaction prior to closing;

(4) the transferee has agreed to be bound by all of the terms and conditions of this Agreement for the remainder of its Term or, at our option, must

execute our then current standard form of franchise agreement and related documents used in the state in which your BUSINESS is located (which may provide for different royalties, advertising contributions and expenditures, duration and other rights and obligations than those provided in this Agreement);

(5) you pay us a transfer fee equal to the higher of Ten Thousand ($10,000) Dollars and an amount equal to the actual expenses we incur in connection with the Transfer, including the costs of training the transferee (or its Responsible Person) and its other personnel, reasonable legal fees and administrative costs incurred, and our reasonable out-of-pocket expenses, including, without limitation, travel, meals, lodging and other investigative expenses involved in meeting with or qualifying the transferee. If the proposed Transfer is among your Owners, Article 13.3(5) will not apply, although you are required to reimburse us for any reasonable legal and administrative costs we incur in connection with the Transfer;

(6) you (and your transferring Owners) have executed a general release, in form satisfactory to us, of any and all claims against us and our shareholders, officers, directors, employees and agents;

(7) we have approved the material terms and conditions of such Transfer and determined that the price and terms of payment will not adversely affect the transferee's operation of the BUSINESS;

(8) if you or your Owners finance any part of the sale price of the transferred interest, you and/or your Owners have agreed that all of the transferee's obligations pursuant to any promissory notes, agreements or security interests that you or your Owners have reserved in the BUSINESS are subordinate to the transferee's obligation to pay Royalties, NAF contributions and other amounts due to us and otherwise to comply with this Agreement; and

(9) you and/or any transferring Owner(s) have executed an agreement in favor of us agreeing to remain bound by the restrictions contained in Articles 16.2., 16.3. and 16.4. hereof as if this Agreement had terminated. You agree that the restrictions referenced in the immediately preceding sentence will continue to apply regardless of whether you and/or any transferring Owner(s) actually execute an agreement confirming the survival of these restrictions. You and each of your Owners further agree that the provisions of Article 19.13 and 19.14 survive the partial or full Transfer of an Owner's interest in you and that California law and jurisdiction will apply to any dispute that arises out of or relates to this Agreement. This Article 13.3(9) applies equally to partial Transfers of interest by any one or more Owners.

RJFA (3/17)

EAST\146514907.3
**EXHIBIT 1**

**13.4** **TRANSFER TO A WHOLLY OWNED ENTITY.** Notwithstanding Article 13.3., if you are in full compliance with this Agreement, you may Transfer this Agreement to an entity which conducts no business other than the BUSINESS and, if applicable, other **ROCKIN' JUMP** businesses, in which you maintain management control and of which you own and control one hundred (100%) percent of the equity and voting power of all issued and outstanding capital stock, and further provided that all assets of the BUSINESS are owned, and the entire business of the BUSINESS is conducted, by a single entity. Transfers of shares in such entity will be subject to the provisions of Article 13.3. Notwithstanding anything to the contrary herein, you agree to remain personally liable under this Agreement as if the Transfer to such entity had not occurred.

**13.5** **TRANSFER UPON YOUR DEATH OR DISABILITY.** Upon your death or permanent disability or, if you are a corporation partnership, limited liability company or other entity, the death or permanent disability of the Owner of a controlling interest in you, your or such Owner's executor, administrator, conservator, guardian or other personal representative must Transfer your interest in this Agreement or such Owner's interest in you to a third party. Such disposition of this Agreement or the interest in you (including, without limitation, Transfer by bequest or inheritance) must be completed within a reasonable time, not to exceed six (6) months from the date of death or permanent disability, and will be subject to all of the terms and conditions applicable to Transfers contained in this Article. A failure to Transfer your interest in this Agreement or the ownership interest in you within this period of time constitutes a breach of this Agreement. For purposes hereof, the term "permanent disability" means a mental or physical disability, impairment or condition that is reasonably expected to prevent or actually does prevent you or an Owner of a controlling interest in you from managing and operating the BUSINESS for a period of three (3) months from the onset of such disability, impairment or condition.

**13.6** **OPERATION UPON YOUR DEATH OR DISABILITY.** If, upon your death or permanent disability or the death or permanent disability of the Owner of a controlling interest in you, the BUSINESS is not being managed by a trained manager, your or such Owner's executor, administrator, conservator, guardian or other personal representative must within a reasonable time, not to exceed fifteen (15) days from the date of death or permanent disability, appoint a manager to operate the BUSINESS. Such manager will be required to successfully complete training at your expense within sixty (60) days of being appointed to operate the BUSINESS. Pending the appointment of a manager as provided above or if, in our judgment, the BUSINESS is not being managed properly any time after your death or permanent disability or after the death or permanent disability of the Owner of a controlling interest in you, we have the right, but not the obligation, to appoint a manager for the BUSINESS. All funds from the operation of the BUSINESS during the management by our appointed manager will be kept in a separate account, and all expenses of the BUSINESS, including compensation, other costs and travel and living expenses of our manager, will be charged to this

account. We also have the right to charge a reasonable management fee (in addition to the Royalty and NAF contributions payable under this Agreement) during the period that our appointed manager manages the BUSINESS. Operation of the BUSINESS during any such period will be on your behalf, provided that we only have a duty to utilize reasonable efforts in doing so and will not be liable to you or your Owners for any debts, losses or obligations incurred by the BUSINESS or to any of your creditors for any products, materials, supplies or services the BUSINESS purchases during any period it is managed by our appointed manager.

**13.7**    <u>**BONA FIDE OFFERS.**</u>   If you (or any of your Owners) at any time determine to sell, assign or Transfer for consideration an interest in this Agreement and the BUSINESS or an ownership interest in you, you (or such Owner) agree to obtain a *bona fide*, executed written offer and earnest money deposit (in the amount of five (5%) percent or more of the offering price) and a complete franchise application from a fully disclosed offeror including lists of the owners of record and beneficially of any corporate or limited liability company offeror and all general and limited partners of any partnership and immediately submit to us a true and complete copy of such offer, which includes details of the payment terms of the proposed sale. To be a valid, *bona fide* offer, the proposed purchase price must be denominated in a dollar amount. The offer must apply only to an interest in you or in this Agreement and the BUSINESS and may not include an offer to purchase any of your (or your Owners') other property or rights. However, if the offeror proposes to buy any other property or rights from you (or your Owners) under a separate, contemporaneous offer, such separate, contemporaneous offer must be disclosed to us, and the price and terms of purchase offered to you (or your Owners) for the interest in you or in this Agreement and the BUSINESS must reflect the *bona fide* price offered therefor and not reflect any value for any other property or rights. Any Transfer in violation of our right of first refusal is null and void.

**13.8**    <u>**OUR RIGHT OF FIRST REFUSAL.**</u>   We have the right, exercisable by written notice delivered to you or your selling Owners within thirty (30) days from the date of the delivery to us of both an exact copy of such *bona fide* offer and all other information we request, to purchase such interest for the price and on the terms and conditions contained in such *bona fide* offer, provided that:

(1)      we may substitute cash for any form of payment proposed in such offer;

(2)      our credit will be deemed equal to the credit of any proposed purchaser;

(3)      we will have not less than sixty (60) days after giving notice of our election to purchase to prepare for closing; and

(4)      we are entitled to receive, and you and your Owners agree to make, all customary representations and warranties given by the seller of the assets of a business or the capital stock of an incorporated business, as

**EXHIBIT 1**

applicable, including, without limitation, representations and warranties as to:

(a)     ownership and condition of and title to stock or other forms of ownership interest and/or assets;

(b)     liens and encumbrances relating to the stock or other ownership interest and/or assets; and

(c)     validity of contracts and the liabilities, contingent or otherwise, of the corporation whose stock is being purchased.

**13.9     NON-EXERCISE.**  If we do not exercise our right of first refusal, you or your Owners may complete the sale to such purchaser pursuant to and on the exact terms of such *bona fide* offer, subject to our approval of the Transfer as provided in Articles 13.2., 13.3. and 13.4. If the sale to such purchaser is not completed within one hundred twenty (120) days after delivery of such *bona fide* offer to us, or if there is a material change in the terms of the sale (which you agree promptly to communicate to us), the sale will be treated as a new sale subject to our right of first refusal as provided in Article 13.8.

**14.     EXPIRATION OF THIS AGREEMENT.**

**14.1     ACQUISITION OF A SUCCESSOR FRANCHISE.**  Upon expiration of the Initial Term of this Agreement, if you (and each of your Owners) are in full compliance with this Agreement during its term, and provided that you maintain possession of and agree to remodel and/or expand the BUSINESS, add or replace improvements, equipment and signs and otherwise modify the BUSINESS as we require to bring it into compliance with specifications and standards then applicable for **ROCKIN' JUMP** businesses, or if you are unable to maintain possession of the Location, or if in our judgment the BUSINESS should be relocated, you secure substitute premises we approve, develop such premises in compliance with specifications and standards then applicable for **ROCKIN' JUMP** businesses and continue to operate the BUSINESS at the Location until operations are transferred to the substitute premises, then, subject to the terms and conditions set forth in this Article 14, you will have the right to acquire a successor franchise to operate the BUSINESS as a **ROCKIN' JUMP** business on the terms and conditions of the franchise agreement we are then customarily using in granting successor franchises for **ROCKIN' JUMP** businesses, provided, however, that the successor franchise fee will be equal to twenty five (25%) percent of the franchise fee we are then currently customarily charging for new franchises.

**14.2     GRANT OF A SUCCESSOR FRANCHISE.**  You must give us written notice of your desire to acquire a successor franchise not less than six (6) months nor more than twelve (12) months prior to the expiration of this Agreement. We will

give you notice (**"Our Notice"**), not later than sixty (60) days after receipt of your notice, of our decision, pursuant to Article 14.1:

(1) to grant you one (1) ten (10) year successor franchise;

(2) to grant you a successor franchise on the condition that deficiencies of the BUSINESS, or in your operation of the BUSINESS, are corrected; or

(3) not to grant you a successor franchise based on our determination that you and your Owners have not substantially complied with this Agreement during its term.

14.3 **NO GRANT.** If we elect not to grant a successor franchise, Our Notice will describe the reasons for our decision. Your right to acquire a successor franchise is subject to your continued compliance with all of the terms and conditions of this Agreement through the date of its expiration, in addition to your compliance with the obligations described in Our Notice.

14.4 **90 DAY CURE.** If Our Notice states that you must cure certain deficiencies of the BUSINESS or its operation as a condition to the grant of a successor franchise, we will give you written notice of a decision not to grant a successor franchise, based upon your failure to cure such deficiencies, not less than ninety days prior to the expiration of this Agreement, provided, however, that we will not be required to give you such notice if we decide not to grant you a successor franchise due to your breach of this Agreement during the one hundred eighty (180) day period prior to its expiration. We may extend the term of this Agreement for such period of time as is necessary in order to provide you with either reasonable time to correct deficiencies or the ninety (90) day notice of our refusal to grant a successor franchise required hereunder if we fail to give you the following:

(1) notice of deficiencies in the BUSINESS, or in your operation of the BUSINESS, within ninety (90) days after we receive your timely election to acquire a successor franchise; or

(2) notice of our decision not to grant a successor franchise at least ninety (90) days prior to the expiration of this Agreement.

14.5 **AGREEMENTS/RELEASES.** If you satisfy all of the other conditions to the grant of a successor franchise, you and your Owners agree to execute the form of franchise agreement and any ancillary agreements we are then customarily using in connection with the grant of successor franchises for **ROCKIN' JUMP** businesses. You and your Owners further agree to execute general releases, in form satisfactory to us, of any and all claims against us and our shareholders, officers, directors, employees, agents, successors and assigns. Failure by you or your Owners to sign such agreements and releases and deliver them to us for

RJFA (3/17)

acceptance and execution within thirty (30) days after their delivery to you will be deemed an election not to acquire a successor franchise.

15. **TERMINATION OF AGREEMENT.**

15.1 **BY YOU.** If you and your Owners are in compliance with this Agreement and we materially fail to comply with this Agreement and do not correct such failure within sixty (60) days after written notice of such material failure is delivered to us, you may terminate this Agreement effective thirty (30) days after delivery to us of written notice of termination. Your termination of this Agreement for any other reason or without such notice will be deemed null and void.

15.2 **IMMEDIATE TERMINATION.** You are in material breach of this Agreement, and this Agreement will automatically terminate without notice, if you:

(1) become insolvent by reason of your inability to pay your debts as they mature;

(2) if you are adjudicated bankrupt or insolvent;

(3) if you file a petition in bankruptcy, reorganization or similar proceeding under the bankruptcy laws of the United States or have such a petition filed against you which is not discharged within thirty (30) days;

(4) if a receiver or other custodian, permanent or temporary, is appointed for your business, assets or property;

(5) if you request the appointment of a receiver or make a general assignment for the benefit of creditors;

(6) if final judgment against you in the amount of Twenty Five Thousand ($25,000) Dollars or more remains unsatisfied of record for thirty (30) days or longer;

(7) if your bank accounts, property or accounts receivable are attached;

(8) if execution is levied against your business or property;

(9) if suit is filed to foreclose any lien or mortgage against any of your assets and such suit is not dismissed within thirty (30) days;

(10) if you voluntarily dissolve or liquidate or have a petition filed for corporate or partnership dissolution and such petition is not dismissed within thirty (30) days;

(11) if you fail to lease, sublease or purchase the Location in accordance within the timeframe set forth in Article 4.2;

43

EAST\146514907.3
**EXHIBIT 1**

JBG 000160

(12)     if you fail to meet any construction deadline set forth in Article 4 hereof.

**15.3**     **TERMINATION UPON NOTICE.**   In addition to our right to terminate pursuant to other provisions of this Agreement and under applicable law, we have the right to terminate this Agreement, effective upon delivery of notice of termination to you, if you or any of your Owners or affiliates:

(1)     fail to open your BUSINESS and start business, in the time period required under this Agreement;

(2)     abandon or fail to actively operate your BUSINESS for three (3) consecutive business days, except where such failure to actively operate results solely from causes beyond your reasonable control;

(3)     surrender or transfer control of the operation of your BUSINESS without our prior written consent;

(4)     have made any material misrepresentation or omission in connection with your purchase of the Franchise;

(5)     suffer cancellation or termination of the lease or sublease for your BUSINESS;

(6)     are convicted of, or plead no contest to, a felony or other crime or offense that we reasonably believe may adversely affect the System or the goodwill associated with the Marks;

(7)     make an unauthorized assignment of this Agreement or of an ownership interest in you or the BUSINESS;

(8)     make any unauthorized use or disclosure of any Confidential Information or use, duplicate or disclose any portion of the Operations Manual in violation of this Agreement;

(9)     fail or refuse to comply with any mandatory specification, standard, or operating procedure prescribed by us relating to the cleanliness or sanitation of your BUSINESS or violate any health, safety or sanitation law, ordinance or regulation, that we reasonably believe may pose harm to the public or to your or our reputation, and do not correct such failure, refusal or violation within twenty four (24) hours after written notice thereof is delivered to you;

(10)     fail to establish, maintain and/or have sufficient funds available in the designated account as required by Article 5.5. of this Agreement or fail to make payment of any amounts due us or any of our Affiliates, and do not correct such failure within ten (10) days after written notice of such failure is delivered to you;

RJFA (3/17)

EAST\146514907.3

**EXHIBIT 1**

JBG 000161

(11)    fail to make a timely payment of any amount due to a supplier unaffiliated with us (other than payments which are subject to bona fide dispute), and do not correct such failure within thirty (30) days after we deliver to you notice of such failure to comply;

(12)    fail to comply with any other provision of this Agreement or any other agreement between you (or any of your Owners) and us or our affiliates, and do not correct such failure within thirty (30) days after notice of such failure to comply is delivered to you;

(13)    fail on three (3) or more separate occasions within any period of twelve (12) consecutive months to submit when due reports or other data, information or supporting records or to pay when due Royalties, NAF contributions or other payments due us, any of our Affiliates or any unaffiliated suppliers or otherwise fail to comply with this Agreement, whether or not such failure is corrected after notice is delivered to you;

(14)    fail to pay when due any federal or state income, service, sales, employment related or other taxes due on the operations of the BUSINESS, unless you are, in good faith, legally contesting your liability for such taxes;

(15)    fail to appoint a manager within fifteen (15) days after your death or permanent disability or the death or permanent disability of the Owner of a controlling interest in you or such manager fails to complete our training within sixty (60) days after being appointed;

(16)    violate Article 6.8 herein without provision of any cure period; or

(17)    fail to comply with the requirements for the condition of your BUSINESS under Article 9.4 hereof.

We have no obligation whatsoever to refund any portion of the franchise fee upon any termination of this Agreement.

**15.4**    <u>**OUR RIGHT TO OPERATE THE BUSINESS AND MANAGEMENT FEE.**</u>
If we issue you a notice of default and you fail to cure such default within any applicable time period, we have the right, without the obligation, and without waiving our right to terminate this Agreement as a result of such failure, to assume the operation of the BUSINESS for such length of time as we determine in our business judgment. You authorize us to operate the BUSINESS for so long as we deem necessary and practical, and without waiver of any other rights or remedies we may have under this Agreement. All monies from the operation of the BUSINESS during such period of operation by us shall be accounted for separately and the expenses of the business, including travel, food, lodging, and salaries of our representatives who operate the BUSINESS, shall be charged to such account. We shall be entitled to retain fifty percent (50%) of the gross

EXHIBIT 1

revenue of your BUSINESS as our management fee after operating expenses are paid. You shall indemnify us and our representatives from any and all claims arising from the acts and omissions of us and our representatives pursuant to this Article 15.4.

15.5   **<u>ALTERNATIVES TO TERMINATION.</u>**   In addition to our rights under Article 15.4, if we issue you a notice of default and you fail to cure such default within any applicable time period, we have the right in our business judgment, without the obligation, and without waiving our right to terminate this Agreement as a result of such failure, to temporarily or permanently limit, curtail, or remove certain services or benefits provided or required to be provided to you hereunder, including, but not limited to:

(1)     restricting your or any of your staff's attendance at any training, meetings, workshops, or conventions;

(2)     refusing to sell or furnish to you any advertising or promotional materials;

(3)     refusing to provide you with ongoing advice about the operation of the BUSINESS;

(4)     refusing any of your requests to approve a new supplier or the use of any advertising or promotional materials; and

(5)     refusing to permit you to enter into a new franchise agreement for a Rockin' Jump business at any other location.

You shall hold us harmless with respect to any action we take pursuant to this Article 15.5; and you agree that we shall not be liable for any loss, expense, or damage you incur because of any action we take pursuant to this Article 15.5. Nothing in this Article 15.5 constitutes a waiver of any of our rights or remedies under this Agreement or any other agreement between us and you, including the right to terminate this Agreement. You agree that our exercise of our rights pursuant to this Article 15.5 shall not be deemed a constructive termination of this Agreement or of any other agreement between us and you, and shall not be deemed a breach of any provision of this Agreement. We may, in our business judgment, reinstate any services or benefits removed, curtailed, or limited pursuant to this Article 15.5, and you agree to accept immediately any such reinstatement of services or benefits so removed, curtailed, or limited. If we limit any services or benefits under this Article 15.5, you shall continue to pay timely all fees and payments required under this Agreement and any other agreement between us and you, including any fees associated with services or benefits limited by us. You shall have no right to a refund of any fees paid in advance for such services or benefits.

**16.    OUR AND YOUR RIGHTS AND OBLIGATIONS UPON TERMINATION OR EXPIRATION OF THIS AGREEMENT.**

EAST\146514907.3

RJFA (3/17)

JBG 000163

**EXHIBIT 1**

**16.1** **PAYMENT OF AMOUNTS OWED TO US - LIQUIDATED DAMAGES.** You agree to pay us within fifteen (15) days after the effective date of termination, for any reason, or expiration of this Agreement, or on such later date that the amounts due to us are determined, such Royalties, NAF contributions, amounts owed for purchases from us, interest due on any of the foregoing and all other amounts owed to us which are then unpaid. If we terminate this Agreement for cause, you must pay us liquidated damages equal the average monthly Royalty fees paid by you during the twelve (12) months immediately preceding the period multiplied by the remaining term of your franchise agreement after termination.

**16.2** **MARKS.** Upon the termination, for any reason, or expiration of this Agreement:

(1)    you may not directly or indirectly at any time or in any manner (except with respect to other **ROCKIN' JUMP** businesses you own and operate) identify yourself or any business as a current or former **ROCKIN' JUMP** business, or as one of our licensees or franchisees, use any Marks, any colorable imitation thereof or other indicia of a **ROCKIN' JUMP** business in any manner or for any purpose or utilize any purpose any trade name, trademark or service mark or other commercial symbol that indicates or suggests a connection or association with us;

(2)    you agree to take such action as may be required to cancel all fictitious or assumed names or equivalent registrations relating to your use of any Marks;

(3)    if we do not exercise our option to purchase the BUSINESS pursuant to Article 16.11., you agree to deliver to us within thirty (30) days after the Notification Date the Operations Manual, all signs, sign-faces, sign-cabinets, marketing materials, forms, packaging and other materials containing any Marks or otherwise identifying or relating to a **ROCKIN' JUMP** business and allow us, without liability to you or third parties, to remove all such items from the BUSINESS;

(4)    if we do not exercise our option to purchase the BUSINESS pursuant to Article 16.11., you agree that, after the Notification Date, you will promptly and at your own expense make such alterations as we may specify to distinguish the BUSINESS clearly from its former appearance and from other **ROCKIN' JUMP** businesses so as to prevent confusion therewith by the public;

(5)    if we do not exercise our option to purchase the BUSINESS pursuant to Article 16.11., you agree that, after the Notification Date and in accordance with the Assignment of Telephone Numbers attached as **Appendix E** to this Agreement, you will notify the telephone company and all telephone directory publishers of the termination or expiration of your right to use any telephone, telecopy or other numbers and any regular, classified or other telephone directory listings associated with any

47

Marks, authorize the transfer of such numbers and directory listings to us or at our direction and/or instruct the telephone company to forward all calls made to your telephone numbers to numbers we specify; and

(6)    you agree to furnish us, within thirty (30) days after the Notification Date, with evidence satisfactory to us of your compliance with the foregoing obligations.

**16.3**    <u>**DE-BRANDING.**</u>  You agree that, upon termination of this Agreement, for any reason, or expiration of this Agreement, you will immediately comply with our then-current de-branding checklist, which shall require you to, among other things:

(1)    Remove and destroy all interior and exterior signage, point of sale materials, business forms, and stationery received from us;

(2)    Delete from all computer hard drives all materials, information, communications, manuals, and marketing and promotion materials received from us;

(3)    Remove all decals containing the **ROCKIN' JUMP** name, slogans, or green/yellow color scheme;

(4)    Repaint or remove all green and yellow colors from all exercise equipment, walls, doors, floors, and other surfaces;

(5)    Promptly instruct all third-party internet sites and telephone directories to remove all listings identifying the location as a **ROCKIN' JUMP**;

(6)    Return all uniforms, sales materials, operations manuals, and other items that contain any Confidential Information;

(7)    Cancel all fictitious or assumed names or equivalent registrations relating to your use of any of the Marks;

(8)    Change your corporate or legal business name, if necessary, so that it does not contain any of the Marks; and

(9)    Return to us all signs, sign-faces, sign-cabinets, marketing materials, forms, packaging, and other materials that contain any of the Marks.

**16.4**    <u>**CONFIDENTIAL INFORMATION.**</u>  You agree that, upon termination of this Agreement (including the full or partial transfer of rights by Franchisee or any Owner), for any reason, or expiration of this Agreement, you will immediately and forever cease to use any of our Confidential Information in any business or otherwise and return to us all copies of the Operations Manual and any other confidential materials, including, without limitation, computer software and any

EXHIBIT 1

mechanisms (electronic key) used to access the software, that we have allowed you to use.

16.5 **IN-TERM COVENANT NOT TO COMPETE.** You specifically acknowledge that, pursuant to this Agreement, you will receive valuable, specialized training, Confidential Information (as defined in Article 8.1 hereof), and other proprietary and specialized information and knowledge that provide a valuable, competitive advantage in operating a trampoline park. You further acknowledge that we would be unable to protect the Confidential Information against unauthorized use or disclosure or to encourage the free exchange of ideas and information among our franchisees if you were permitted to hold interests in or perform services for a Competitive Business, and we have granted you the rights hereunder in consideration of, and in reliance upon, your agreement to deal exclusively with us. You therefore covenant that during the term of this Agreement (except as otherwise approved in writing by us), you, your Owners, and you and their Immediate Families shall not, either directly, indirectly or through, on behalf of, or in conjunction with any person or legal entity:

(1)     Divert or attempt to divert any present or prospective business or customer of any ROCKIN' JUMP business to any non-ROCKIN' JUMP competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and the System;

(2)     Recruit, employ or seek to employ any person who is at that time, or has been within the past six (6) months, employed by us or one of our affiliates, employed by any of our other franchisees or otherwise directly or indirectly induce such person to leave his or her employment; or

(3)     Own, maintain, operate, engage in, be employed by, act as a consultant for, perform services for, provide assistance to, or have any interest in (as owner or otherwise) any Competitive Business.

16.6 **POST-TERM COVENANT NOT TO COMPETE.** You covenant that, except as otherwise approved in writing by us, you and your Owners shall not, for a continuous, uninterrupted period of two (2) years commencing upon the date of: (a) a transfer permitted under Article 13 of this Agreement, with respect only to Transfers that result in you no longer owning and operating the BUSINESS (or, in the case of an Owner, results in that Owner no longer having any direct or indirect ownership in you); (b) expiration of this Agreement; (c) termination or non-renewal of this Agreement (regardless of the cause for termination or non-renewal); or (d) a final order of a duly authorized arbitrator, panel of arbitrators, or a court of competent jurisdiction (after all appeals have been taken) with respect to any of the foregoing or with respect to enforcement of this Article 16.6; either directly or indirectly, for yourself or your Immediate Family, or through, on behalf of, or in conjunction with any person or legal entity, own, maintain, operate, engage in, be employed by, act as a consultant for, perform services for,

RJFA (3/17)

EXHIBIT 1

provide assistance to, or have any interest in (as owner or otherwise) any Competitive Business that is, or is intended to be, located (a) at the Location, (b) within fifteen (15) miles of the Location, or (c) fifteen (15) miles of any ROCKIN' JUMP business in operation or under construction as of the date that you are required to comply with this Article 16.6. You agree and acknowledge that the two (2) year period of this restriction shall be tolled during any time period in which you are in violation of this restriction.

The restrictions in Articles 16.5.3 and 16.6 do not apply to: (a) interests in or operation of a ROCKIN' JUMP business under a written Franchise Agreement with us; or (b) the ownership of shares of a class of securities that are listed on a public stock exchange or traded on the over-the-counter market and that represent less than five percent (5%) of that class of securities.

16.7 **REASONABLE SCOPE OF COVENANTS.** You acknowledge that the scope of the restrictions in Articles 16.5 and 16.6 are reasonable and necessary to protect us, the Confidential Information, and the System, and that such restrictions are designed solely to prevent you from taking information, materials, training, and know-how that we provided to you and using them to compete with us. In addition, your operation of a Competitive Business in violation of Article 16.5 or 16.6 would necessarily involve your use of Confidential Information that would result in an unfair competitive advantage vis-à-vis other ROCKIN' JUMP franchisees. You further acknowledge that you and your Owners possess skills and abilities of a general nature and have other opportunities for exploiting these skills. Consequently, our enforcement of the covenant in Article 16.6 will not deprive you or your Owners of personal goodwill or the ability to engage in a lawful trade or business and earn a living.

16.8 **REDUCTION OF SCOPE OF COVENANTS.** You understand and acknowledge that we shall have the right, in our business judgment, to reduce the scope of any covenant set forth in Articles 16.5 and 16.6, or any portion thereof, without your consent, effective immediately upon receipt by you of written notice thereof; and you agree that you shall comply forthwith with any covenant as so modified, which shall be fully enforceable.

16.9 **COVENANT NOT TO COMPETE UPON EXERCISE OF RIGHT OF FIRST REFUSAL.** If we exercise our right of first refusal pursuant to Article 13.8. above, you and your selling Owner(s) agree that, for a period of two (2) years commencing on the date of the closing, you and they will be bound by the noncompetition covenant contained in Article 16.6 hereof.

16.10 **COMMENCEMENT BY ORDER.** If any person restricted by this Article refuses voluntarily to comply with the foregoing obligations, the Restriction Period will commence with the entry of an order of an arbitrator, or court if necessary, enforcing this provision. You and your Owners expressly acknowledge that you possess skills and abilities of a general nature and have other opportunities for exploiting such skills. Consequently, enforcement of the

50

EAST\146514907.3
**EXHIBIT 1**

JBG 000167

covenants made in this Article will not deprive you of your personal goodwill or ability to earn a living.

**16.11**   **OUR RIGHT TO PURCHASE BUSINESS.**

(1)   Exercise of Option. Upon termination or expiration of this Agreement in accordance with its terms and conditions, we have the option, exercisable by giving written notice thereof to you within sixty (60) days from the date of such termination or expiration, to purchase the BUSINESS from you, including the leasehold rights to the Location, free and clear of all liens, restrictions or encumbrances. (The date on which we notify you whether or not we are exercising our option is referred to in this Agreement as the "**Notification Date**.") We have the unrestricted right to assign this option to purchase the BUSINESS. We will be entitled to all customary warranties and representations in connection with our asset purchase, including, without limitation, representations and warranties as to ownership and condition of and title to assets; liens and encumbrances on assets; validity of contracts and agreements; and liabilities effecting the assets, contingent or otherwise.

(2)   Leasehold Rights. You agree, at our election, to assign your leasehold interest in the Location to us or, to enter into a sublease for the remainder of the lease term on the same terms (including renewal options) as the prime lease.

(3)   Purchase Price. The purchase price for the BUSINESS will be its fair market value, determined in a manner consistent with reasonable depreciation of the BUSINESS's equipment, signs, inventory, materials and supplies, provided that the BUSINESS will be valued as an independent business and its value will not include any value for the Franchise or any rights granted by this Agreement, the Marks, or participation in the network of **ROCKIN' JUMP** businesses.

(4)   Fair Market Value. The BUSINESS's fair market value will include the reasonable goodwill you developed since your commencement of operations that exists independent of the goodwill of the Marks and the System. The length of the remaining term of the lease for the Location will also be considered in determining the BUSINESS's fair market value.

(5)   Exclusions. We may exclude from the assets purchased hereunder cash or its equivalent and any equipment, signs, inventory, materials and supplies that are not reasonably necessary (in function or quality) to the BUSINESS's operation or that we have not approved as meeting standards for **ROCKIN' JUMP** businesses, and the purchase price will reflect such exclusions.

EAST\146514907.3

RJFA (3/17)

JBG 000168

EXHIBIT 1

(6) Appraisal. If we and you are unable to agree on the BUSINESS's fair market value, its fair market value will be determined by one (1) independent qualified appraiser that we appoint in our business judgment. We will appoint the appraiser within fifteen (15) days after the date we determine we are unable to agree on the BUSINESS's fair market value. You and we will share equally the fees and expenses of the appraiser. You and we further agree to take reasonable actions to cause the appraiser to complete the appraisal within thirty (30) days after the appraiser's appointment.

(7) Closing. The purchase price will be paid at the closing of the purchase, which will take place not later than ninety (90) days after determination of the purchase price. We have the right to set off against the purchase price, and thereby reduce the purchase price by, any and all amounts you or your Owners owe to us.

(8) Instruments. At the closing, you agree to deliver instruments transferring:

(a) good and merchantable title to the assets purchased, free and clear of all liens and encumbrances (other than liens and security interests acceptable to us, if any), with all sales and other transfer taxes paid by you; and all licenses and permits of the BUSINESS which may be assigned or transferred; and

(b) the leasehold interest in the Location and improvements thereon.

(9) Escrow. If you cannot deliver clear title to all of the purchased assets, or if there are other unresolved issues, the closing of the sale will, at our election, be accomplished through an escrow arrangement with an independent escrow agent selected by us.

(10) Releases. You and your owners agree to execute general releases, in form satisfactory to us, of any and all claims against us and our shareholders, officers, directors, employees, agents, successors and assigns.

**16.12** **CONTINUING OBLIGATIONS.** All of our and your (and your owners' and affiliates') obligations which expressly or by their nature survive the expiration or termination of this Agreement will continue in full force and effect subsequent to and notwithstanding its expiration or termination and until they are satisfied in full or by their nature expire.

**17.** **SECURITIES OFFERINGS.**

**17.1** **SECURITIES OFFERINGS.** Neither you nor any of your owners may issue or sell, or offer to issue or sell, any of your securities or any securities of any of your affiliates, regardless of whether such sale or offer would be required to be registered pursuant to the provisions of the Securities Act of 1933, as amended, or

the securities laws of any other jurisdiction, without obtaining our prior consent and complying with all of our requirements and restrictions concerning use of information about us and our Affiliates. Neither you nor any of your Owners may issue or sell your securities or the securities of any of your affiliates if: (1) such securities would be required to be registered pursuant to the Securities Act of 1933, as amended, or such securities would be owned by more than 35 persons; or (2) after such issuance or sale, you or such affiliate would be required to comply with the reporting and information requirements of the Securities Exchange Act of 1934, as amended. Any proposed private placement of your or of your affiliate's securities must be approved by us.

18. **RELATIONSHIP OF THE PARTIES AND INDEMNIFICATION.**

18.1 <u>**INDEPENDENT CONTRACTORS.**</u> Neither this Agreement nor the dealings of the parties pursuant to this Agreement shall create any fiduciary relationship or any other relationship of trust or confidence between the parties hereto. Franchisor and Franchisee, as between themselves, are and shall be independent contractors. If applicable law shall imply a covenant of good faith and fair dealing in this Agreement, the parties hereto agree that such covenant shall not imply any rights or obligations that are inconsistent with a fair construction of the terms of this Agreement. Additionally, if applicable law shall imply such covenant, we and you acknowledge and agree that (a) this Agreement (and the relationship of the parties which arises from this Agreement) grants us the right to make decisions, take actions and/or refrain from taking actions not inconsistent with your explicit rights and obligations hereunder that may affect favorably or adversely your interests; (b) we will use our judgment in exercising such rights based on our assessment of our own interests and balancing those interests against the interests of the owners of **ROCKIN' JUMP** businesses generally (including ourselves, and our Affiliates and other franchisees), and specifically without considering your individual interests or the individual interests of any other particular franchisee; (c) we will have no liability to you for the exercise of our rights in this manner so long as such rights are not exercised in bad faith toward you; and (d) in the absence of such bad faith, no trier of fact in any legal action or arbitration proceeding shall substitute its judgment for our judgment so exercised. Nothing contained in this Agreement, or arising from the conduct of the parties hereunder, is intended to make either party a general or special agent, joint venturer, partner or employee of the other for any purpose whatsoever. You must conspicuously identify yourself in all dealings with customers, lessors, contractors, suppliers, public officials, employees and others as the owner of your BUSINESS and must place such other notices of independent ownership on such forms, business cards, stationery, advertising and other materials as we may require from time to time. You may not make any express or implied agreements, warranties, guarantees or representations or incur any debt in our name or on our behalf or represent that the relationship of the parties hereto is anything other than that of independent contractors. We will not be obligated by or have any liability under any agreements made by you with any third party or for any representations made by

**EXHIBIT 1**

you to any third party. We will not be obligated for any damages to any person or property arising directly or indirectly out of the operation of your business hereunder.

**18.2**     **NO LIABILITY FOR ACTS OF OTHER PARTY.**   You agree not to employ any of the Marks in signing any contract or applying for any license or permit, or in a manner that may result in our liability for any of your indebtedness or obligations, and that you will not use the Marks in any way we have not expressly authorized. Neither we nor you will make any express or implied agreements, warranties, guarantees or representations or incur any debt in the name or on behalf of the other, represent that our respective relationship is other than franchisor and franchisee or be obligated by or have any liability under any agreements or representations made by the other that are not expressly authorized in writing. We will not be obligated for any damages of any nature whatsoever to any person or property directly or indirectly arising out of the BUSINESS's operation or the business you conduct pursuant to this Agreement.

**18.3**     **TAXES.**    We will have no liability for any sales, use, service, occupation, employment related, excise, gross receipts, income, property or other taxes, whether levied upon you or the BUSINESS, in connection with the business you conduct (except any taxes we are required by law to collect from you with respect to purchases from us). Payment of all such taxes is your sole responsibility. Further, you will pay all state and local taxes, including, without limitation, sales, use, service, occupation, employment related, excise, gross receipts, income, property or other taxes, that may be imposed on us as a result of our receipt or accrual of the Initial Franchise Fee, royalty fees, advertising fees, extension fees, and all other fees that are referenced in this Agreement, whether assessed against you through withholding or other means or whether paid by us directly, unless the tax is credited against income tax otherwise payable by us. In such event, you will pay to us (or to the appropriate governmental authority) such additional amounts as are necessary to provide us, after taking such taxes into account (including any additional taxes imposed on such additional amounts), with the same amounts that we would have received or accrued had such withholding or other payment, whether by you or by us, not been required.

**18.4**     **INDEMNIFICATION.**  You, and each of the Guarantors identified in **Appendix B**, agree that you shall, at all times, indemnify, exculpate, defend and hold harmless, to the fullest extent permitted by law, us, our successor, assigns, and Affiliates (including but not limited to Rockin' Jump Corporate, LLC and Rockin' Jump Holdings, LLC), and the respective officers, directors, shareholders, agents, representatives, independent contractors, servants, and employees of each of them (the "Indemnified Parties") from all losses and expenses incurred in connection with any action, suit, proceeding, claim, demand, investigation, or inquiry (formal or informal), or any settlement thereof, which arises out of or is based upon any of the following: the infringement, alleged infringement or any other violation by you, your Guarantors or principals of any patent, mark, copyright, or other proprietary right owned or controlled by third parties due to your unauthorized

54

use of all or any portion of the Marks and/or System; the violation, breach, or asserted violation or breach by you, your Guarantors or principals of any federal, state, or local law, regulation, ruling or industry standard; libel, slander, or any other form of defamation by you or your Guarantors or principals; the violation or breach by you or by your Guarantors or principals of any warranty, representation, agreement, or obligation of this Agreement or in any other agreement between you and us or our Affiliates; acts, errors, omissions of you, any of your affiliates, any of your principals, officers, directors, shareholders, agents, representatives, independent contractors, and employees of you and your affiliates in connection with the establishment and operation of the BUSINESS, including, but not limited to, any acts, errors, or omissions of any of the foregoing in the operation of any motor vehicle or in the establishment or implementation of security for the BUSINESS; and any of the foregoing that are alleged to be caused by an Indemnified Party's negligence, unless (and then only to the extent that) the claims, obligations, and damages are determined to be caused solely by the Indemnified Party's gross negligence or willful misconduct according to a final, unappealable ruling issued by a court or arbitrator with competent jurisdiction. For purposes of this indemnification, "claims" includes all obligations, damages (actual, consequential or otherwise) and costs incurred in the defense of any claim against any of the Indemnified Parties, including, without limitation, reasonable accountants', arbitrators', attorneys' and expert witness fees, costs of investigation and proof of facts, court costs, other expenses of litigation, arbitration or alternative dispute resolution and travel and living expenses. We have the right to defend any such claim against us at your expense. This indemnity will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

18.5    **MITIGATION NOT REQUIRED.**   Under no circumstances will we or any other Indemnified Party be required to seek recovery from any insurer or other third party, or otherwise to mitigate our, their or your losses and expenses, in order to maintain and recover fully a claim against you. You agree that a failure to pursue such recovery or mitigate a loss will in no way reduce or alter the amounts we or another Indemnified Party may recover from you.

19.    **ENFORCEMENT AND MISCELLANEOUS MATTERS.**

19.1    **SEVERABILITY AND SUBSTITUTION OF VALID PROVISIONS.** Except as expressly provided to the contrary herein, each provision of this Agreement, and any portion thereof, will be considered severable, and if, for any reason, any such provision is held to be invalid or contrary to or in conflict with any applicable present or future law or regulation in a final, unappealable ruling issued by any court, agency or tribunal with competent jurisdiction in a proceeding to which we are a party, that ruling will not impair the operation of, or have any other effect upon, such other portions of this Agreement as may remain otherwise intelligible, which will continue to be given full force and effect and bind the parties hereto, although any portion held to be invalid will be deemed not to be a part of this Agreement from the date the time for appeal expires, if you are

55

a party thereto, otherwise upon your receipt from us of a notice of non-enforcement thereof.

19.2 **LESSER COVENANT ENFORCEABLE.** If any covenant herein which restricts competitive activity is deemed unenforceable by virtue of its scope in terms of area, business activity prohibited and/or length of time, but would be enforceable by reducing any part or all thereof, you and we agree that such covenant will be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction whose law is applicable to the validity of such covenant.

19.3 **GREATER NOTICE.** If any applicable and binding law or rule of any jurisdiction requires a greater prior notice than is required hereunder of the termination of this Agreement or of our refusal to enter into a successor franchise agreement, or the taking of some other action not required hereunder, or if, under any applicable and binding law or rule of any jurisdiction, any provision of this Agreement or any part of Methods of Operation is invalid or unenforceable the prior notice and/or other action required by such law or rule will be substituted for the comparable provisions hereof, and we will have the right to modify such invalid or unenforceable provision or unenforceable part of this Agreement or the Operations Manual or any part of Methods of Operation to the extent required to be valid and enforceable. You agree to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any provision hereof as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof, or any part of Methods of Operation, any portion or portions which a court or arbitrator may hold to be unenforceable in a final decision to which we are a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order or arbitration award. Such modifications to this Agreement will be effective only in such jurisdiction, unless we elect to give them greater applicability, and will be enforced as originally made and entered into in all other jurisdictions.

19.4 **WAIVER OF OBLIGATIONS.** We and you may by written instrument unilaterally waive or reduce any obligation of or restriction upon the other under this Agreement, effective upon delivery of written notice thereof to the other or such other effective date stated in the notice of waiver. Any waiver we grant will be without prejudice to any other rights we may have, will be subject to our continuing review and may be revoked at any time and for any reason, effective upon delivery to you of ten (10) days' prior written notice.

19.5 **NON-WAIVER.** We and you will not be deemed to have waived or impaired any right, power or option reserved by this Agreement (including without limitation the right to demand exact compliance with every term, condition and covenant herein or to declare any breach thereof to be a default and to terminate this Agreement prior to the expiration of its term) by virtue of any custom or practice at variance with the terms hereof; our or your failure refusal or neglect to

EAST\146514907.3

RJFA (3/17)

EXHIBIT 1

JBG 000173

exercise any right under this Agreement or to insist upon exact compliance by the other with our and your obligations hereunder including without limitation Methods of Operation; our waiver, forbearance, delay, failure, or omission to exercise any right, power or option whether of the same, similar or different nature with respect to other **ROCKIN' JUMP** businesses; the existence of other franchise agreements for **ROCKIN' JUMP** businesses which contain different provisions from those contained herein; or our acceptance of any payments due from you after any breach of this Agreement. No special or restrictive legend or endorsement on any check or similar item given to us will constitute a waiver, compromise, settlement or accord and satisfaction. We are authorized to remove or obliterate any legend or endorsement, and such legend or endorsement will have no effect.

19.6 **FORCE MAJEURE.** Neither we nor you will be liable for loss or damage or deemed to be in breach of this Agreement if our or your failure to perform our or your obligations is not our or your fault and results from:

(1) transportation shortages, inadequate supply of equipment, products, merchandise, supplies, labor, material or energy or the voluntary foregoing of the right to acquire or use any of the foregoing in order to accommodate or comply with the orders, requests, regulations, recommendations or instructions of any federal, state or municipal government or any department or agency thereof;

(2) acts of nature;

(3) fires, strikes, embargoes, war or riot;

(4) failure to obtain land use or environmental approvals from the applicable government body or agency, so long as you diligently pursue any such required approvals; or

(5) any other similar event or cause.

19.7 **EXTEND PERFORMANCE.** Any delay resulting from any of said causes will extend performance accordingly or excuse performance, in whole or in part, as may be reasonable, except that said causes will not excuse payments of amounts owed at the time of such occurrence or payment of Royalties and Ad Fees due on any sales thereafter.

19.8 **OUT-OF-STOCK AND DISCONTINUED.** We are not liable to you for any loss or damage, or deemed to be in breach of this Agreement, if we cannot deliver, or cause to be delivered, or if our Affiliates or designated sources or approved suppliers cannot deliver, all of your orders for products, merchandise, equipment, supplies, etc., where such things are out-of-stock or discontinued.

RJFA (3/17)

EAST\146514907.3
# EXHIBIT 1

**19.9** **COSTS AND ATTORNEYS' FEES.** If we incur expenses in connection with your failure to pay when due amounts owed to us or to submit when due any reports, information or supporting records or otherwise to comply with this Agreement, you agree to reimburse us for any of the costs and expenses which we incur, including, without limitation, reasonable accounting, attorneys', arbitrators' and related fees.

**19.10** **YOU MAY NOT WITHHOLD PAYMENTS DUE TO US.** You agree that you will not withhold payment of any amounts owed to us on the grounds of our alleged nonperformance of any of our obligations hereunder. You agree that all such claims will, if not otherwise resolved by us, be submitted to arbitration as provided in Article 19.12.

**19.11** **RIGHTS OF PARTIES ARE CUMULATIVE.** Our and your rights hereunder are cumulative, and no exercise or enforcement by us or you of any right or remedy hereunder will preclude our or your exercise or enforcement of any other right or remedy hereunder which we or you are entitled by law to enforce.

**19.12** **DISPUTE RESOLUTION.**

(1)     _Mediation_. Except as provided in Article 19.12(3) prior to filing any demand for arbitration, the parties agree to mediate any dispute, controversy or claim between and among the parties and any of our or your affiliates, officers, directors, shareholders, members, guarantors, employees or owners arising under, out of, in connection with or in relation to this Agreement, any lease or sublease for your Business, any loan or other finance arrangement between us or our affiliates and you, the parties' relationship, your Business, or any System Standard in accordance with the following procedures:

(a)     The party seeking mediation must commence mediation by sending the other party, in accordance with Article 20, a written notice of its request for mediation headed "Notification of Dispute." The Notification of Dispute will specify, to the fullest extent possible, the party's version of the facts surrounding the dispute; the amount of damages and the nature of any injunctive or other relief such party claims. The party (or parties as the case may be) receiving a Notification of Dispute will respond within twenty (20) days after receipt thereof, in accordance with Article 19, stating its version of the facts and, if applicable, its position as to damages sought by the party initiating the dispute procedure; provided, however, that if the dispute has been the subject of a default notice given under Article 15 of this Agreement, the other party will respond within ten (10) business days.

(b)     Upon receipt of a Notification of Dispute and response under Article 19.12(1), the parties will endeavor, in good faith, to resolve

58

the dispute outlined in the Notification of Dispute and response. If the parties have been unable to resolve a dispute outlined in a Notification of Dispute or a response thereto within twenty (20) days after receipt of the response, either party may initiate a mediation procedure with the American Arbitration Association ("AAA"), pursuant to its Commercial Mediation Procedures, and unless otherwise agreed by the parties will take place in the city of our then-current corporate headquarters. The parties must select a mediator jointly.

(c)    All mediation sessions will occur in California at a mutually agreeable location and must be attended by an Owner (who has authority to settle the dispute on your behalf) and our representative(s) who is/are authorized to settle the dispute. The parties may be represented by counsel at the mediation. The parties agree to participate in the mediation proceedings in good faith and with the intention of resolving the dispute if at all possible within 30 days of the notice from the party seeking to initiate the mediation procedures. If the dispute is not resolved within 30 days, any party may initiate an arbitration pursuant to Article 19.12(2). In addition, if the party receiving notice of mediation has not responded within 5 days of delivery of the notice or a party fails to participate in the mediation, this Article 19.12(1) will no longer be applicable and the other party can pursue arbitration. The parties agree that the costs of the mediator will be split equally between the parties. Each party must pay its own fees and expenses incurred in connection with the mediation. The mediation proceeding and any negotiations and results thereof will be treated as a compromise settlement negotiation and the entire process is confidential. At least 5 days prior to the initial mediation session, each party must deliver a written statement of positions.

(2)    <u>Arbitration</u>. Except as provided in Article 19.12(3), any dispute, controversy or claim between you and us and any of our or your Affiliates, officers, directors, shareholders, members, guarantors, employees or owners arising under, out of, in connection with or in relation to this Agreement, any lease or sublease for your Business, any loan or other finance arrangement between us or our Affiliates and you, the parties' relationship, your Business, or any System Standard or the scope of validity of the arbitration obligation under this Article not resolved by mediation must be submitted to binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect by one arbitrator.

(a)    In connection with any arbitration proceeding, each party will submit or file any claim which would constitute a compulsory

59

**EXHIBIT 1**

counterclaim (as defined by the then-current Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any such claim which is not submitted or filed in such proceeding will be barred.

(b)    Any arbitration must be on an individual basis only as to a single franchise (and not as or through an association) and the parties and the arbitrator will have no authority or power to proceed with any claim on a class-wide basis or otherwise to join or consolidate any claim with any claim or any other proceeding involving third parties. If a court or arbitrator determines that this limitation on joinder of or class-wide claims is unenforceable, then the agreement to arbitrate the dispute will be null and void and the parties must submit all claims to the jurisdiction of the courts, in accordance with Article 19.14.

(c)    The arbitration must take place in the city where our headquarters is located at the time of the dispute.

(d)    The arbitrator must follow the law and not disregard the terms of this Agreement. The arbitrator must be a former federal or state court judge with at least five years of significant experience in commercial law. The arbitrator may not consider any settlement discussions or offers that might have been made by either you or us. The arbitrator may not under any circumstance (a) stay the effectiveness of any pending termination of this Agreement, (b) assess punitive or exemplary damages, (c) certify a class or a consolidated action, or (d) make any award which extends, modifies or suspends any lawful term of this Agreement or any reasonable standard of business performance that we set. The arbitrator will have the right to make a determination as to any procedural matters as would a court of competent jurisdiction be permitted to make in the state in which our corporate headquarters is then located. The arbitrator will also decide any factual, procedural, or legal questions relating in any way to the dispute between the parties, including, but not limited to: any decision as to whether Article 19.14 is applicable and enforceable as against the parties, subject matter, timeliness, scope, remedies, unconscionability, and any alleged fraud in the inducement.

(e)    The arbitrator can issue summary orders disposing of all or part of a claim and provide for temporary restraining orders, preliminary injunctions, injunctions, attachments, claim and delivery proceedings, temporary protective orders, receiverships, and other equitable and/or interim/final relief. Each party consents to the enforcement of such orders, injunctions, etc., by any court having jurisdiction.

EAST\146514907.3

**EXHIBIT 1**

(f)    The arbitrator will have subpoena powers limited only by the laws of the state in which our corporate headquarters is then located.

(g)    The parties to the dispute will have the same discovery rights as are available in civil actions under the laws of the state in which our corporate headquarters is then located.

(h)    All other procedural matters will be determined by applying the statutory, common laws, and rules of procedure that control a court of competent jurisdiction in which our corporate headquarters is then located.

(i)    Other than as may be required by law, the entire arbitration proceedings (including, but not limited to, any rulings, decisions or orders of the arbitrator), will remain confidential and will not be disclosed to anyone other than the parties to this Agreement.

(j)    The judgment of the arbitrator on any preliminary or final arbitration award will be final and binding and may be entered in any court having jurisdiction.

(k)    We reserve the right, but have no obligation, to advance your share of the costs of any arbitration proceeding in order for such arbitration proceeding to take place and by doing so will not be deemed to have waived or relinquished our right to seek recovery of those costs in accordance with Article 19.9 or 19.12(4).

(3)    <u>Exceptions to Arbitration</u>. Notwithstanding Articles 19.12(1) and 19.12(2), the parties agree that the following claims will not be subject to arbitration or mediation:

(a)    any action for equitable relief, including, without limitation, seeking preliminary or permanent injunctive relief, specific performance, declaratory relief, other relief in the nature of equity to enjoin any harm or threat of harm to such party's tangible or intangible property, brought at any time, including without limitation, prior to or during the pendency of any arbitration proceedings initiated hereunder;

(b)    any action in ejectment or for possession of any interest in real or personal property;

(c)    any action which by applicable law cannot be arbitrated; or

(d)    our decision in the first instance to issue a notice of default and/or notice of termination, or undertake any other conduct with respect

RJFA (3/17)

EAST\146514907.3

JBG 000178

**EXHIBIT 1**

to the franchise relationship that might later result in a dispute or controversy between us.

(4) <u>Costs and Attorneys' Fees</u>. The prevailing party in any action or proceeding arising under, out of, in connection with, or in relation to this Agreement will be entitled to recover its reasonable costs and expenses (including attorneys' fees, arbitrator's fees and expert witness fees, costs of investigation and proof of facts, court costs, and other arbitration or litigation expenses) incurred in connection with the claims on which it prevailed.

(5) <u>Survival</u>. The provisions of this Article 19.12 are intended to benefit and bind certain third party non-signatories and will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

(6) <u>Tolling of Statute of Limitations</u>. All applicable statutes of limitation and defenses based on the passage of time are tolled while the dispute resolution procedures in this Article 19.12 are pending. The parties will take such action, if any, required to effectuate such tolling.

(7) <u>Performance to Continue</u>. Each party must continue to perform its obligations under this Agreement pending final resolution of any dispute pursuant to this Article 19.12, unless to do so would be impossible or impracticable under the circumstances.

**19.13** <u>**GOVERNING LAW.**</u>  All matters relating to the enforceability of any non-competition obligations will be governed by the law of the state in which your franchise location is located, without reference to its choice of law principles.  All matters relating to arbitration will be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 *et. seq.*). Except to the extent governed by the Federal Arbitration Act as required hereby, the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. §§ 1051 *et seq.*) or other federal law, this Agreement (with the exception of any provisions relating to any non-competition obligation), the franchise and all claims arising from the relationship between us and you will be governed by the laws of California, without regard to its conflict of laws principles, except that any law regulating the sale of franchises or governing the relationship of a franchisor and its franchisee will not apply unless jurisdictional requirements are met independently without reference to this Article.

**19.14** <u>**CONSENT TO JURISDICTION.**</u>  Subject to Article 19.12. hereof, you and your Owners agree that we may institute any action against you or your Owners in any state or federal court of general jurisdiction in the state where our principal place of business is then located and you (and each Owner) irrevocably submit to the jurisdiction of such courts and waive any objection you (or he or she) may have to either the jurisdiction of or venue in such courts.

RJFA (3/17)

**EXHIBIT 1**

**19.15** <u>**WAIVER OF PUNITIVE DAMAGES, JURY TRIAL AND CLASS ACTIONS.**</u>  Except with respect to your obligation to indemnify us pursuant to Article 18.4. and 18.5. hereof and claims we bring against you for your unauthorized use of the Marks or unauthorized use or disclosure of any Confidential Information, we and you and your respective Owners waive to the fullest extent permitted by law any right to or claim for any punitive or exemplary damages against the other and agree that, in the event of a dispute between us, the party making a claim will be limited to equitable relief and to recovery of any actual damages it sustains. We and you irrevocably waive, to the fullest extent permitted by law, trial by jury in any action, proceeding or counterclaim, whether at law or in equity, brought by either of us.  This waiver is effective even if a court of competent jurisdiction decides that the arbitration provision in this Article 19 is unenforceable. Each party acknowledges that it has had a full opportunity to consult with counsel concerning this waiver, and that this waiver is informed, voluntary, intentional, and not the result of unequal bargaining power.

**19.16** <u>**BINDING EFFECT.**</u>  This agreement is binding upon us and you and our respective executors, administrators, heirs, beneficiaries, assigns and successors in interest and may not be modified except by written agreement signed by you and us.

**19.17** <u>**LIMITATIONS OF CLAIMS.**</u>  Except for claims arising from your nonpayment or underpayment of amounts you owe us pursuant to this Agreement, or claims related to your unauthorized use of the Marks, any and all claims arising out of or relating to this Agreement or our relationship with you will be barred unless a judicial proceeding is commenced within one (1) year from the date on which the party asserting such claim knew or should have known of the facts giving rise to such claims.

**19.18** <u>**CONSTRUCTION.**</u>  The preambles and exhibits are a part of this Agreement which, together with the Operations Manual and our other written policies, constitute our and your entire agreement except as provided below, and there are no other oral or written understandings or agreements between us and you relating to the subject matter of this Agreement, except that you acknowledge that we justifiably have relied on your representations made prior to the execution of this Agreement as set forth in Article 1 hereof.  Except as contemplated by the provisions of Article 19.12. hereof, nothing in this Agreement is intended, nor is deemed, to confer any rights or remedies upon any person or legal entity not a party hereto.

**19.19** <u>**WITHHOLD APPROVAL.**</u>  Except where this Agreement expressly obligates us reasonably to approve or not unreasonably to withhold our approval of any of your actions or requests, we have the absolute right to refuse any request you make or to withhold our approval of any of your proposed or effected actions that require our approval.

EXHIBIT 1

19.20   **HEADINGS.**  The headings of the several Articles hereof are for convenience only and do not define, limit or construe the contents of such Articles.

19.21   **JOINT AND SEVERAL OWNERS' LIABILITY.**  If two or more persons are at any time the owner of the BUSINESS hereunder, whether as partners or joint venturers, their obligations and liabilities to us will be joint and several. References to "owner" mean any person holding a direct or indirect, legal or beneficial ownership interest or voting rights in you (or a transferee of this Agreement and the BUSINESS or an interest in you), including, without limitation, any person who has a direct or indirect interest in you (or a transferee), this Agreement, the Franchise or the BUSINESS and any person who has any other legal or equitable interest, or the power to vest in himself any legal or equitable interest, in the revenue, profits, rights or assets thereof. References to a "controlling interest" in you mean thirty three and one-third (33.33%) percent or more of your voting shares or other voting rights if you are a corporation, partnership or limited liability company owned by three (3) or more persons; otherwise, fifty (50%) percent or more of your voting shares or other voting rights will constitute a "controlling interest." "Person" means any natural person, corporation, limited liability company, general or limited partnership, unincorporated association, cooperative or other legal or functional entity.

19.22   **ANTI-TERRORISM LAWS.**  You acknowledge that it is our intent to comply with all anti-terrorism laws enacted by the U.S. Government, including but not limited to the USA PATRIOT ACT or Executive Order 13324. You acknowledge that you are not now, nor have you ever been, a suspected terrorist or otherwise associated directly or indirectly with terrorist activity. At any time during the term of this Agreement, if we are prohibited from doing business with you under any anti-terrorism law enacted by the U.S Government, then this Agreement may be terminated immediately.

19.23   **RIGHT TO INFORMATION.**  You consent to us obtaining, using and disclosing to third parties (including, without limitation, financial institutions, legal and financial advisors, and prospective franchisees), for any purpose we specify or as may be required by law, all financial and other information (including, without limitation, membership data and customer lists) contained in or resulting from information, data, materials, statements and reports related, directly or indirectly, to the BUSINESS.

19.24   **MULTIPLE COPIES.**  This Agreement may be executed in counterparts, each of which will be deemed an original, and all of which when taken together shall constitute one and the same document. For purposes of this Agreement, a formal written document on paper with wet signatures (pen on paper signatures) and otherwise consistent with the requirements herein, which is transmitted by facsimile, the internet, or any cell/wireless/mobile telephone system, or the like, as an image or PDF document is valid when signed by pen on paper.

RJFA (3/17)

**EXHIBIT 1**

19.25 **ENTIRE AGREEMENT BETWEEN THE PARTIES.** This Agreement together with any exhibits, addenda and appendices hereto constitute the sole agreement between you and us with respect to the entire subject matter of this Agreement and embody all prior agreements and negotiations with respect to your BUSINESS authorized hereunder. We expressly disclaim any understandings, agreements, inducements, course(s) of dealing, representations (financial or otherwise), promises, options, rights of first refusal, guarantees, warranties (express or implied) or otherwise (whether oral or written) which are not fully expressed in this Agreement. Nothing in this or any related agreement, however, is intended to disclaim the representations made by us in the Franchise Disclosure Document that was furnished to you by us.

19.26 **AMENDMENTS.** No change, modification, amendment or waiver of any of the provisions hereof, including by custom, usage of trade, or course of dealing or performance, shall be effective and binding upon either party unless it is in writing, specifically identified as an amendment hereto and signed by a duly authorized representative of both parties.

## 20. NOTICES AND PAYMENTS.

20.1 **NOTICES.** All written notices and reports permitted or required to be delivered by the provisions of this Agreement or the Operations Manual will be deemed so delivered:

(1)     at the time delivered by hand;

(2)     one (1) business day after transmission by telecopy, facsimile or other electronic system, provided there is evidence of delivery;

(3)     one (1) business day after being placed in the hands of a commercial courier service for next business day delivery, provided there is evidence of delivery; or

(4)     five (5) business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid; and must be addressed to the party to be notified at its most current principal business address of which the notifying party has been notified. Any required payment or report which we do not actually receive during regular business hours on the date due (or postmarked by postal authorities at least two (2) days prior thereto) will be deemed delinquent.

"**Business day**" shall be a business day in the recipient's jurisdiction.

20.2 **PAYMENTS.** All payments required to be delivered by the provisions of this Agreement or the Operations Manual will be deemed so delivered as provided in Article 20.1. above, and will be deemed delivered by EFT or bank-wire transfer upon telephone or electronic confirmation with the receiving bank.

EAST\146514907.3

RJFA (3/17)

# EXHIBIT 1

JBG 000182

      **20.3**   **<u>NO REPRESENTATION OF SUCCESS. FRANCHISEE AND EACH OF THE UNDERSIGNED OWNERS WARRANTS AND REPRESENTS THAT HE/SHE HAS NOT RELIED UPON ANY GUARANTEES CONCERNING REVENUE, PROFIT OR THE SUCCESS OF THIS FRANCHISE IN SO SIGNING.</u>**

**[Signature page follows]**

RJFA (3/17)

EAST\146514907.3

EXHIBIT 1

JBG  000183

**IN WITNESS WHEREOF,** the parties hereto have executed and delivered this Agreement as of the Effective Date.

THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES.

**EFFECTIVE DATE:** _9/27/17_

ROCKIN' JUMP FRANCHISE, LLC

By: _____

Joseph Freschi

Title: EVP & General Counsel

JUMP BUFFALO GROVE LLC

By: _James J. Gondeck_

Title: _Managing Member_

Dated: _9/27/17_

67

## APPENDIX A

## OWNERSHIP ADDENDUM

1.    **RESPONSIBLE PERSON**. The name, home address and the last four (4) of the social security number of the Responsible Person is as follows:    James J. Gondeck, 545 Orchard Pond Drive, Lake Zurich, Illinois 60047, (847) 274-9350, Last SSN No. 5436

2.    **FORM OF ENTITY OF FRANCHISEE.**

(a)    **CORPORATION OR LIMITED LIABILITY COMPANY**. Franchisee was organized on September 11, 2017 under the laws of the State of Illinois. Its Federal Employer Identification Number is 82-2780596.  It has not conducted business under any name other than its corporate or company name.

Name of Each Director/Officer/Managing Member Position(s) Held

| James J. Gondeck | Managing Member |
|---|---|
|  |  |
|  |  |
|  |  |

(b)    **PARTNERSHIP.**  Franchisee is a general or limited partnership formed on _____ _____, under the laws of the State of _____.    Its  Federal Employer Identification Number is _____.    It has not conducted business under any name other than its partnership name.

Name of Each General Partner

_____

_____

_____

_____

3.    **OWNERS.**

(a)    Franchisee and each of its Owners represents and warrants that the following is a complete  and  accurate  list  of  all  Owners  of  any  interest  whatsoever  in  Franchisee,

RJFA (3/17)

EXHIBIT 1

JBG  000185

including the full name, mailing address and social security number of each Owner, and fully describes the nature and extent of each Owner's interest in Franchisee. Franchisee and each Owner as to his ownership interest, represents and warrants that each Owner is the sole and exclusive legal and beneficial owner of his ownership interest in Franchisee, free and clear of all liens, restrictions, agreements and encumbrances of any kind or nature, other than those required or permitted by this Agreement.

| Owner's Name, Address and Last 4 of the Social Security Number | Percentage and Nature of Ownership Interest |
|---|---|
| James J. Gondeck<br>545 Orchard Pond Drive<br>Lake Zurich, Illinois 60047<br>Last 4 SSN: 5436 | 100% |

(b)     **Control Group.** You represent and warrant that the following Owner or group of Owners has, directly or indirectly, 51% or more ownership interest in you and voting control over its ownership interests in you and constitutes your Control Group as described in Article 2.4 of the Franchise Agreement.

Owner's Name, Address and
Last 4 of the Social Security Number

Percentage and Nature of
Ownership Interest

_____          _____

_____          _____

_____          _____

_____          _____

Appendix A-2

EAST\146514907.3
EXHIBIT 1

This **Appendix A** is deemed accepted and made a part of the Franchise Agreement as of the Franchise Agreement's Effective Date.

JUMP BUFFALO GROVE LLC
A _Illinois_ Limited Liability Company

ROCKIN' JUMP FRANCHISE, LLC
A California Limited Liability Company

By: _James J. Gondeck_

By: _____

Print Name: _James J. Gondeck_

Print Name: Joseph Freschi

Title: _Managing Member_

Title: EVP & General Counsel

Date: _9/27/17_

Date: 10/22/17

Owners:

_James J. Gondeck_
(Signature)

_____
(Date)

JAMES J. GONDECK
(Print Name)

Appendix A-3

EAST\146514907.3

**EXHIBIT 1**

JBG 000187

## APPENDIX B

## OWNERS' PERSONAL GUARANTY OF
## FRANCHISEE'S OBLIGATIONS ("Guaranty")

In consideration of, and as an inducement to, the execution of the Rockin' Jump Franchise, LLC Franchise Agreement dated as of _____9/27/17_____ _____ (the "**Agreement**") by and between the Rockin' Jump Franchise, LLC ("**Franchisor**"), and Jump Buffalo Grove LLC ("**Franchisee**"), each of the undersigned Owners of greater than ten percent (10%) interest in Franchisee hereby personally and unconditionally: (1) guarantees to Franchisor and its successors and assigns, for the term of the Agreement and thereafter as provided in the Agreement, that Franchisee shall punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement (and any amendments) and that each and every representation of Franchisee made in connection with the Agreement (and any amendments) are true, correct and complete in all respects at and as of the time given; and (2) agrees personally to be bound by, and personally liable for the breach of, each and every provision in the Agreement (and any amendments), including, without limitation, the confidentiality obligations and non-competition covenants in Articles 8 and 16 of the Agreement, respectively.

Each of the undersigned waives: (a) acceptance and notice of acceptance by Franchisor of the foregoing undertakings; (b) notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guaranteed; (c) protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed; (d) any right he may have to require that an action be brought against Franchisee or any other person as a condition of liability; (e) notice of any amendment to the agreement; and (f) any and all other notices and legal or equitable defenses to which he may be entitled.

Each of the undersigned consents and agrees that: (i) his direct and immediate liability under this guaranty shall be joint and several; (ii) he shall render any payment or performance required under the Agreement upon demand if Franchisee fails or refuses to do so punctually; (iii) such liability shall not be contingent or conditioned upon pursuit by Franchisor of any remedies against Franchisee or any other person; and (iv) such liability shall not be diminished, relieved or otherwise effected by any extension of time, credit or other indulgence which the Franchisor may from time to time grant to Franchisee or to any other person including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims, none of which shall in any way modify or amend this guaranty, which shall be continuing and irrevocable until satisfied in full.

It is further understood and agreed by the undersigned that the provisions, covenants and conditions of the Guaranty will inure to the benefit of our successors and assigns.

This Guaranty shall be governed by the governing law provisions set forth in Article 19.13 of the Agreement and all disputes related to it shall be resolved in accordance with the dispute resolution provisions set forth in Articles 19.12, 19.14, 19.15, and 19.17 of the Agreement.

RJFA (3/17)

EXHIBIT 1

**IN WITNESS WHEREOF,** each of the undersigned has hereunto affixed his signature, under seal, as of the Effective Date of the Agreement.

**PERCENTAGE OF OWNERSHIP**　　　　**GUARANTOR (S)**
**INTEREST IN FRANCHISEE**

　　　　　　100%

(Signature)

JAMES J. GONDECK

EAST\146514907.3

EXHIBIT 1

## APPENDIX C

## OWNER PERSONAL COVENANTS REGARDING CONFIDENTIALITY AND NON-COMPETITION

In conjunction with your investment in Jump Buffalo Grove LLC ("**Franchisee**"), you ("**Owner**" or "**you**"), acknowledge and agree as follows:

1.  Franchisee owns and operates, or is developing, a **ROCKIN' JUMP** business located or to be located somewhere in the Exclusive Territory pursuant to a franchise agreement ("**Franchise Agreement**") with Rockin' Jump Franchise, LLC, which Franchise Agreement requires persons with legal or beneficial ownership interests in Franchisee under certain circumstances to be personally bound by the confidentiality and noncompetition covenants contained in the Franchise Agreement. All capitalized terms contained herein shall have the same meaning set forth in the Franchise Agreement.

2.  You own or intend to own a legal or beneficial ownership interest in Franchisee and acknowledge and agree that your execution of this agreement ("**Agreement**") is a condition to such ownership interest and that you have received good and valuable consideration for executing this Agreement. We may enforce this Agreement directly against you and Your Owners (as defined below).

3.  If you are a corporation, partnership, limited liability company or other entity, all persons who have a legal or beneficial interest in you ("**Your Owners**") must also execute this Agreement.

4.  You and Your Owners, if any, may gain access to parts of our Confidential Information as a result of investing in Franchisee. The Confidential Information is proprietary and includes our trade secrets. You and Your Owners hereby agree that while you and they have a legal or beneficial ownership interest in Franchisee and thereafter you and they: (a) will not use the Confidential Information in any other business or capacity (such use being an unfair method of competition); (b) will exert best efforts to maintain the confidentiality of the Confidential Information; and (c) will not make unauthorized copies of any portion of the Confidential Information disclosed in written, electronic or other form. If you or Your Owners cease to have an interest in Franchisee, you and Your Owners, if any, must deliver to us any such Confidential Information in your or their possession.

5.  You specifically acknowledge that you will receive valuable, specialized training, Confidential Information (as defined in Article 8.1 of the Franchise Agreement), and other proprietary and specialized information and knowledge that provide a valuable, competitive advantage in operating a trampoline park. You further acknowledge that we would be unable to protect the Confidential Information against unauthorized use or disclosure or to encourage the free exchange of ideas and information among our franchisees if you were permitted to hold interests in or perform services for a

Competitive Business (as defined in Article 1.4 of the Franchise Agreement), and we have granted you the Franchisee certain rights under the Franchise Agreement in consideration of, and in reliance upon, your agreement to deal exclusively with us. You therefore covenant that during the term of the Franchise Agreement (except as otherwise approved in writing by us), you, Your Owners, and you and their Immediate Families shall not, either directly, indirectly or through, on behalf of, or in conjunction with any person or legal entity:

(a) Divert or attempt to divert any present or prospective business or customer of any ROCKIN' JUMP business to any non-ROCKIN' JUMP competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and the System;

(b) Recruit, employ or seek to employ any person who is at that time, or has been within the past six (6) months, employed by us or one of our affiliates, or otherwise directly or indirectly induce such person to leave his or her employment; or

(c) Own, maintain, operate, engage in, be employed by, act as a consultant for, perform services for, provide assistance to, or have any interest in (as owner or otherwise) any Competitive Business.

6.    You covenant that, except as otherwise approved in writing by us, you and Your Owners shall not, for a continuous, uninterrupted period of two (2) years commencing upon the date of (a) a transfer permitted under Article 13 of the Franchise Agreement, (b) expiration of the Franchise Agreement, (c) termination or non-renewal of the Franchise Agreement (regardless of the cause for termination or non-renewal), or (d) a final order of a duly authorized arbitrator, panel of arbitrators, or a court of competent jurisdiction (after all appeals have been taken) with respect to any of the foregoing or with respect to enforcement of this Paragraph, either directly or indirectly, for yourself or your Immediate Family, or through, on behalf of, or in conjunction with any person or legal entity, own, maintain, operate, engage in, be employed by, act as a consultant for, perform services for, provide assistance to, or have any interest in (as owner or otherwise) any Competitive Business that is, or is intended to be, located (a) at the location of the ROCKIN' JUMP business, (b) within fifteen (15) miles of the location, or (c) fifteen (15) miles of any ROCKIN' JUMP business in operation or under construction as of the date that you are required to comply with this Paragraph 6. You agree and acknowledge that the two (2) year period of this restriction shall be tolled during any time period in which you are in violation of this restriction.

7.    You and each of Your Owners expressly acknowledge the possession of skills and abilities of a general nature and the opportunity to exploit such skills in other ways, so that enforcement of the covenants contained in Articles 5 and 6 will not deprive any of you of your personal goodwill or ability to earn a living. If any covenant herein which restricts competitive activity is deemed unenforceable by virtue of its scope or in terms of geographical area, type of business activity prohibited and/or length of time, but could be rendered enforceable by reducing any part or all of it, you and we agree that it will be enforced to the fullest extent permissible under applicable law and public policy. We may

obtain in any court of competent jurisdiction any injunctive relief, including temporary restraining orders and preliminary injunctions, against conduct or threatened conduct for which no adequate remedy at law may be available or which may cause it irreparable harm. You and each of Your Owners acknowledges that any violation of Articles 4, 5 or 6 hereof would result in irreparable injury for which no adequate remedy at law may be available. If we file a claim to enforce this Agreement and prevails in such proceeding, you agree to reimburse us for all its costs and expenses, including reasonable attorneys' fees.

**IN WITNESS WHEREOF,** each of the undersigned has hereunto affixed his signature, under seal, as of the Effective Date of the Franchise Agreement.

**JUMP BUFFALO GROVE LLC**
A _Illinois_ Limited Liability Company

By: _James J. Gondeck_
Print Name: _James J. Gondeck_
Title: _Managing Member_

**YOUR OWNERS:**
**If you are a corporation, partnership, limited liability company or other legal entity.**

By: _James J. Gondeck_
Print Name: James J. Gondeck

Appendix C-3

**NOT APPLICABLE AT THIS TIME**

**APPENDIX D**

**SILENT INVESTORS**


Franchisee owns and operates, or is developing, a ROCKIN' JUMP business located or to be located at_____ ("**Business**") pursuant to a franchise agreement ("**Franchise Agreement**") with Rockin' Jump Franchise, LLC ("**Franchisor**"). Capitalized terms not defined herein have the meanings set forth in the Franchise Agreement.  Franchisee and its Owners each acknowledge and agree as follows:

1.  <u>Silent Investor</u>. As used in the Franchise Agreement and herein, the term "Silent Investor" means and refers to the following individuals and/or entities:

| Silent Investor Name and Address | Percentage Ownership Interest |
|---|---|
| Silent Investor:<br>Address:_____ | % |
| As owned/controlled by:<br>Address: _____ | % |
| As owned/controlled by:<br>Address: _____ | % |
| Silent Investor:<br>Address:_____ | % |
| As owned/controlled by:<br>Address: _____ | % |
| As owned/controlled by:<br>Address: _____ | % |
| Silent Investor:<br>Address:_____ | % |
| As owned/controlled by:<br>Address: _____ | % |
| As owned/controlled by: | % |

RJFA (3/17)

EAST\146514907.3

EXHIBIT 1

JBG  000193

Address: _____ |

2.    <u>Additional Silent Investors/Franchisor Approval</u>. The addition of Silent Investors, as well as the equity interest of each such Silent Investor, is subject to the Franchisor's prior written approval. Specifically, Franchisee Parties may not add any new Silent Investor unless such person or entity, and any other person or entity that directly or indirectly controls such person or entity, first satisfies, to Franchisor's satisfaction, Franchisor's then-current character and financial requirements applicable to all **ROCKIN' JUMP** franchisees at the time, including, without limitation, the completion of a satisfactory background check and credit check conducted by (or on behalf of) Franchisor. Franchisee and Responsible Person ("Franchisee Parties") must notify Franchisor within seven (7) calendar days of the date that any Silent Investor ceases having an ownership interest in Franchisee.

3.    <u>Silent Investor Prohibitions</u>. Franchisee Parties each agree that no Silent Investor will:

A.    Undertake or exercise an active role in the management or operation of the Business;

B.    Have or otherwise acquire access to Confidential Information or other operating information, including information set forth in the Operations Manual (and/or any component thereof); or

C.    Disclose his/her/its ownership interest in the Business to any third party, except for professional advisors that need to know or as required by law.

4.    Covenants of Franchisee Parties. Franchisee Parties each covenant that they will not give, provide, disseminate, create access to, or otherwise release any or all of the following to any Silent Investor: Confidential Information, operating information other than financial statements, marketing techniques or materials that are similar to those used under or in connection with the **ROCKIN' JUMP** Methods of Operations, member rate structures similar to those used under or in connection with the **ROCKIN' JUMP** Methods of Operations, any of Franchisor's procedures or systems, and any other information that we designate as proprietary and confidential. Franchisee Parties further acknowledge, understand and agree that if a Silent Investor learns Confidential Information or other operating information at any time during or after the term of the Franchise Agreement, Franchisee Parties will be presumed to have disclosed such Confidential Information or other operating information to the Silent Investor(s).

5.    <u>Representation and Warranty</u>. Franchisee Parties expressly represent and warrant to Franchisor that the individuals and/or entities identified in Article 1 above constitute all Silent Investors as of the Effective Date, and that no different or additional Silent Investors will acquire or otherwise obtain an interest in Franchisee absent compliance with the conditions described in Article 2 above.

6.    <u>Liability for Damages</u>. If any or all of the Franchisee Parties violate the confidentiality or non-competition provisions of the Franchise Agreement and/or Article 4 (above), the

RJFA (3/17)

EXHIBIT 1

Franchisee Parties will be jointly and severally liable for any such breach, including, to the fullest extent possible, all damages and costs resulting from Franchisor's enforcement or attempted enforcement against any or all Franchisee Parties of any provision of this Appendix or the Franchise Agreement.

7. <u>Cross Default</u>. For the avoidance of doubt, any breach or default under this Appendix D (including, without limitation, Article 4 above) will be deemed an incurable default under the Franchise Agreement. Franchisee Parties acknowledge that a violation of Articles 3 and/or 4 of this Appendix would result in irreparable injury for which no adequate remedy at law may be available. If Franchisor files a claim to enforce the terms of this Appendix and prevails in such proceeding, Franchisee Parties agree to reimburse Franchisor for all its costs and expenses, including reasonable attorneys' fees.

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of the Effective Date noted below.

JUMP BUFFALO GROVE LLC
A _____ Limited Liability Company

ROCKIN' JUMP FRANCHISE, LLC
A California Limited Liability Company

By: _____

By: _____

Print Name: _____

Print Name: _____

Title: _____

Title: _____

Date: _____

Date: _____

**EFFECTIVE DATE:**_____

Owners:

_____
(Signature)

_____
(Date)

_____
(Print Name)

_____
(Signature)

_____
(Date)

_____
(Print Name)

Appendix D-3

RJFA (3/17)

EXHIBIT 1

## APPENDIX E

## ASSIGNMENT OF TELEPHONE NUMBERS

Date: _9/27/17_

This assignment is effective as of the date of expiration or termination of the Franchise Agreement entered into between Rockin' Jump Franchise, LLC ("**us**") and Jump Buffalo Grove LLC ("**you**"). You hereby irrevocably assign to us or our designee the telephone number or numbers and listings issued to you with respect to each and all of your **ROCKIN' JUMP®** businesses ("telephone numbers"). This assignment is for collateral purposes only and we have no liability or obligation of any kind whatsoever arising from this assignment, unless we desire to take possession and control over the telephone numbers.

We hereby are authorized and empowered upon termination of the Franchise Agreement and without any further notice to you to notify the telephone company, as well as any other company that publishes telephone directories ("**telephone companies**"), to transfer the telephone numbers to us or such other person or entity as we designate. You hereby grant to us an irrevocable power of attorney and appoint us as your attorney-in-fact to take any necessary actions to assign the telephone numbers, including but not limited to, executing any forms that the telephone companies may require to effectuate the assignment. This assignment is also for the benefit of the telephone companies, and the telephone companies may accept this assignment and our instructions as conclusive evidence of our rights in the telephone numbers and our authority to direct the amendment, termination or transfer of the telephone numbers, as if they had originally been issued to us. In addition, Franchisee agrees to hold the telephone companies harmless from any and all claims against them arising out of any actions or instructions by Rockin' Jump Franchise, LLC regarding the telephone numbers.

JUMP BUFFALO GROVE LLC                    ROCKIN' JUMP FRANCHISE, LLC:

By: _James J. Gondeck_                    By: _____

Its: _Managing Member_                    Its: EVP & General Counsel

Date: _9/27/17_                           Date: 10/22/17

EAST\146514907.3

# EXHIBIT 1

**TO BE NEGOTIATED WITH LANDLORD**

**<u>APPENDIX F</u>**

**ADDENDUM TO LEASE**

This addendum ("Addendum") is executed as of this _____ day of _____ _____ , by and between        ("**Franchisee**") and _____ ("**Landlord**")    as    an addendum to the lease (as amended, renewed, and/or extended from time to time, "the **Lease**") for the               premises            located              at _____ , state of _____,    (the    ''**Location**''), dated as of _____.

WHEREAS, Franchisee has executed or intends to execute a Franchise Agreement with Rockin' Jump Franchise, LLC ("**Franchisor**") for the operation of a **ROCKIN' JUMP®** business ("Business") at the Location, and as a requirement thereof, the lease for the Location must contain the provisions contained in this Addendum; and

WHEREAS, Landlord and Franchisee agree that the terms contained herein shall supersede any terms to the contrary set forth in the Lease;

NOW THEREFORE, in consideration of mutual covenants set forth herein, the execution and delivery of the Lease, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Franchisee hereby agree as follows:

1.      Landlord shall deliver to Franchisor a copy of any notice of default or termination of the Lease at the same time such notice is delivered to Franchisee.

2.      Franchisee hereby assigns to Franchisor, with Landlord's irrevocable and unconditional consent, all of Franchisee's rights, title and interest to and under the Lease upon any termination or non-renewal of the Franchise Agreement, but no such assignment shall be effective unless: (a) the Franchise Agreement is terminated or expires without renewal; and (b) Franchisor notifies the Franchisee and Landlord in writing that Franchisor assumes Franchisee's obligations under the Lease.

3.      Franchisor shall have the right, but not the obligation, upon giving written notice of its election to Franchisee and Landlord, to cure any breach of the Lease and, if so stated in the notice, to also succeed to Franchisee's rights, title and interests thereunder.

4.      The Lease may not be modified, amended, renewed, extended or assigned by Franchisee without Franchisor's prior written consent.

5.      Franchisee and Landlord acknowledge and agree that Franchisor shall have no liability or obligation whatsoever under the Lease unless and until Franchisor assumes the Lease in writing pursuant to Article 2 or 3 above.

RJFA (3/17)

EAST\146514907.3

**EXHIBIT 1**

JBG  000197

6.     If Franchisor assumes the lease as provided for in Articles 2 or 3 above, Landlord and Franchisee agree that (i) Franchisee will remain liable for the responsibilities and obligations, including amounts owed to Landlord, prior to the date of assignment and assumption, and (ii) Franchisor will have the right to sublease the Premises to another franchisee, provided the franchisee agrees to operate the Location as a ROCKIN' JUMP business pursuant to a Franchise Agreement with Franchisor. Franchisor will be responsible for the lease obligations incurred after the effective date of the assignment.

7.     Landlord and Franchisee hereby acknowledge that Franchisee has agreed under the Franchise Agreement that Franchisor and its employees or agents shall have the right to enter the Location for certain purposes. Landlord hereby agrees not to interfere with or prevent such entry by Franchisor, its employees or agents. Landlord and Franchisee hereby further acknowledge that in the event the Franchise Agreement expires (without renewal) or is terminated, Franchisee is obligated to take certain steps under the Franchise Agreement to de-identify the location as a ROCKIN' JUMP business. Landlord agrees to permit Franchisor, its employees or agents, to enter the Location and remove signs, decor and materials displaying any marks, designs or logos owned by Franchisor, provided Franchisor shall bear the expense of repairing any damage to the Location as a result thereof.

8.     Landlord agrees to allow Franchisee to remodel, equip, paint and decorate the interior and exterior of the Location pursuant to the terms of the Franchise Agreement and any successor Franchise Agreement under which Franchisee may operate the Business at the Location.

9.     Copies of any and all notices required or permitted hereby or by the Lease shall also be sent to Franchisor at 5502 Sunol Boulevard, Pleasanton, CA 94566, Attn: Chief Legal Officer, or such other address as Franchisor shall specify by written notice to Landlord.

10.    Under the Franchise Agreement, any lease for the location of a ROCKIN' JUMP business is subject to Franchisor's approval. Accordingly, the Lease is contingent upon such approval.

11.    Franchisor is a third party beneficiary under this Addendum.

12.    References to the Lease and the Franchise Agreement include all amendments, addenda, extensions and renewals to such documents.

13.    References to the Landlord, Franchisee and Franchisor include the successors and assigns of each of the parties.

**[Signature blocks on next page]**

EXHIBIT 1

WITNESS the execution hereof under seal.

LANDLORD:

_____

Date: _____, _____

FRANCHISEE:

_____

Date: _____, _____

RJFA (3/17)

EAST\146514907.3

EXHIBIT 1

JBG 000199

## APPENDIX G

## LOCATION

The approved location is: 950 Busch Parkway, Buffalo Grove, Illinois 60089.

If no location is approved at the time this Agreement is signed, this **Appendix G** will be updated when a location has been designated by you and approved by us. The location must be designated and your lease signed within 6 months of the Effective Date of this Agreement.

JUMP BUFFALO GROVE LLC:                     ROCKIN' JUMP FRANCHISE, LLC:


By: _James J. Gondeck_                          By: _____

Its: ___Managing Member___                      Its: EVP & General Counsel

Date: ___9/27/17___                             Date: 10/22/17

RJFA (3/17)

EAST\146514907.3

## EXHIBIT 1

JBG 000200

## APPENDIX G-1

## EXCLUSIVE TERRITORY



EAST\146514907.3

RJFA (3/17)

JBG 000201

**EXHIBIT 1**

**ACKNOWLEDGMENT ADDENDUM TO**
**THE ROCKIN' JUMP FRANCHISE AGREEMENT**

As you know, you and we are entering into a Franchise Agreement for the operation of a ROCKIN' JUMP franchise. The purpose of this Acknowledgment Addendum is to determine whether any statements or promises were made to you that we have not authorized or that may be untrue, inaccurate or misleading, and to be certain that you understand the limitations on claims that may be made by you by reason of the offer and sale of the franchise and operation of your business. Please review each of the following questions carefully and provide honest responses to each question.

**Acknowledgments and Representations**\*.

1. Did you receive a copy of our Disclosure Document (and all exhibits and attachments) at least (a) 14 calendar days prior to signing the Franchise Agreement, or (b) if you are a resident of Iowa, New York or Oklahoma, at the earlier or the first personal meeting or 10 business days before the execution of the franchise or other agreement or payment of any consideration, or if you are a resident of Michigan, Oregon or Wisconsin, at the earlier of 10 business days before the execution of any binding agreement or payment of any consideration, or (d) if you are a resident of Washington, 14 calendar days prior to payment or execution of the Franchise Agreement?  Check one: ☒ Yes. ☐ No.

2. Have you studied and reviewed carefully our Disclosure Document and Franchise Agreement? Check one: ☒ Yes. ☐ No.

3. Is the name, address and phone number of any broker and each of our employees or representatives who was involved in offering you this franchise listed on the Disclosure Document receipt you signed (or on any updated receipt we provided to you)? Check one: ☐☒ Yes. ☐ No.

4. Do you understand that the Franchise Agreement contains the entire agreement between you and us concerning the franchise, meaning that any prior oral or written statements not included in the Franchise Agreement or our Disclosure Document will not be binding? Check one: ☐☒ Yes ☐☐No.

5. Do you understand that the success or failure of your business will depend in large part on your skills and experience, your business acumen, your location, the local market for products, interest rates, the economy, inflation, the number of employees you hire and their compensation, competition and other economic and business factors?  Check one: ☒ Yes. ☐ No.

6. Do you understand that that, unless there exists a currently effective Multi-Unit Development Agreement between you and us, the franchise granted is for the right to operate a single ROCKIN' JUMP facility at the authorized location only and includes no exclusive area or protected territory, and that we and our affiliates have the right to

Ack. Addendum -1-

issue franchises or operate competing businesses for or at locations, as we determine, near your authorized location? Check one: ☒ Yes. ☐ No.

7. Do you understand that you are bound by the non-compete covenants (both in-term and post- term) listed in Article 16.4 and that an injunction is an appropriate remedy to protect the interests of the ROCKIN' JUMP system if you violate the covenant(s)? Further, do you understand that the term "you" for purposes of the non-compete covenants in defined broadly in Article 16.4, such that any actions in violation of the covenants by those holding any interest in the franchisee entity may result in an injunction, default and termination of the Franchise Agreement?

8. Do you understand that the current economic crisis and financial situation could have a negative impact on the trampoline park industry, the ROCKIN' JUMP franchise system and your business? Do you also understand that the economic situation may worsen? Check one: ☒ Yes. ☐ No.

If you answered "No" to questions 1-8, please explain (attached additional sheets if necessary):
_____
_____
_____
_____
_____
_____

9. Was any oral, written or visual claim or representation made to you which contradicted the disclosures in the Disclosure Document? Check one: ☐ Yes. ☒ No.

10. Except as stated in Item 19 of our Disclosure Document, was any oral, written or visual claim or representation made to you which stated, suggested, predicated or projected your sales, income or profit levels? Check one: ☐ Yes. ☒ No.

11. Except as stated in Item 19 of our Disclosure Document, did any employee or other person speaking on our behalf make any statement or promise regarding the costs involved in operating a franchise that is not contained in the Disclosure Document or that is contrary to or different from the information in the Disclosure Document? Check one: ☐ Yes. ☒ No.

If you answered "Yes" to questions 9-11, please explain in detail the claim, representation or statement (attached additional sheets if necessary): _____
_____
_____
_____
_____
_____
_____

Ack. Addendum -2-

RJFA (3/17)

EXHIBIT 1

YOU UNDERSTAND THAT YOUR ANSWERS ARE IMPORTANT TO US AND THAT WE WILL RELY ON THEM. BY SIGNING THIS ADDENDUM, YOU ARE REPRESENTING THAT YOU HAVE CONSIDERED EACH QUESTION CAREFULLY AND RESPONDED TRUTHFULLY TO THE ABOVE QUESTIONS. IF MORE SPACE IS NEEDED FOR ANY ANSWER, CONTINUE ON A SEPARATE SHEET AND ATTACH.

**<u>NOTE</u>: IF THE RECIPIENT IS A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY, EACH OF ITS OWNERS MUST EXECUTE THIS ACKNOWLEDGMENT.**

JUMP BUFFALO GROVE LLC

By: _James J. Gondeck_

Its: _Managing Member_

Date: _9/27/17_

**OWNERS:**

Signed: _James J. Gondeck_

Print Name: _JAMES J. GONDECK_

Date: _9/27/27_

Ack. Addendum -3-

RJFA (3/17)

EXHIBIT 1

APPROVED ON BEHALF OF
ROCKIN' JUMP FRANCHISE, LLC

Signed: _____          Signed: _____

Print Name: _____          Print Name: Joseph Freschi

Date: _____          Date: 10/22/17

\*Such representations are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Illinois Franchise Disclosure Act or under the Maryland Franchise Registration and Disclosure Law, to the extent applicable. In addition, except to the extent we have negotiated changes to the Franchise Agreement and/or Multi-Unit Development Agreement that differ from the FDD, nothing in this Acknowledgement Addendum or in any related agreement is intended to disclaim representations made in Rockin' Jump Franchise, LLC's 2017 FDD that was provided to you.

EXHIBIT 1